## LYON *vs.* STRONG.

RUTLAND,
*January*
1834.

A sale or exchange of horses, attended with the circumstances which usually attend those exchanges, is a secular labor or employment, within the meaning of the statute for the observance of the Sabbath.

The court will not enforce a contract of this kind made on the Sabbath.

Nor can an action be maintained on a warranty made on the sale or exchange of horses on that day.

This was an action of assumpsit brought on the warranty of a mare. Plea, non-assumpsit.

On trial the plaintiff offered evidence to prove the contract of sale and warranty. It appeared that the sale was made on the —— day of October, 1830, on the Sabbath. ' Evidence · was given by the plaintiff to prove the sale and warranty, by which it appeared that the plaintiff and defendant were making their bargain and trading during the course of the day, conversing about the terms of the trade, and had rode and tried the mare;—that defendant said he would warrant her sound every way, except gravel; and that at or towards evening they finished their trade, by which the plaintiff gave an ox and a cow and three dollars in money for the mare:—that plaintiff then urged, as a reason why he wanted a warranty, that it was so dark that he could not determine whether she had been gravelled or not.

After the evidence of the plaintiff in relation to the sale and warranty was finished, the defendant contended that such a contract, made on the Sabbath, was void.

The court decided that a sale or exchange of horses, and a contract or warranty thereon, made on the Sabbath, was void, and that no action could be maintained thereon. Thereupon the plaintiff became nonsuit, with liberty to move to set it aside if the decision of the court was wrong. The court refused to set aside the nonsuit.

The case comes here upon exceptions taken by the plaintiff to this decision.

*Thrall for plaintiff.*
*Royce for defendant.*

The opinion of the court was pronounced by

WILLIAMS, Ch. J.—From the case it is evident that several questions might have arisen in the course of the trial. 1. The

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

one decided by the county court, whether a contract for the sale and exchange of horses, and a warranty thereon, made on the Sabbath, in the usual way, and attended with all the circumstances which ordinarily attend those exchanges, is so far void that it cannot be enforced in a court of justice. 2. Whether a contract of this kind, made after the setting of the sun on the Sabbath is against the statute. 3. Whether such a contract, commenced and carried on as this was, though not finally closed until after the setting of the sun, can be enforced.

Our attention is necessarily confined to the first of these questions as being the only one decided by the county court. After the evidence for the plaintiff was finished, the defendant contended and submitted to the court, that such a contract, made on the Sabbath, was void. After the decision on this question was pronounced, the plaintiff, without introducing any further testimony, or requiring the defendant to introduce any testimony to determine whether the case would be subject to the decision which might be made on the second and third questions above mentioned, submitted to a nonsuit and excepted to the opinion of the court. Whether the evidence did or would have presented a case to be determined by the opinion which the court might have formed on either of those questions, cannot now be ascertained, as the plaintiff elected to become nonsuit on the decision of the first; probably considering that his chance with a jury on the whole evidence, as to bringing his case out of the rule of law laid down by the court, was not such as would justify him in proceeding further with the evidence. As it is presented, we can only consider the question which the county court determined; and if their decision is erroneous, the nonsuit will be set aside—if otherwise, it must be affirmed.

This I apprehend is purely a question of law, to be decided by the constitution and statute of this state, and by the application of those principles of law which have been known, acknowledged, and never controverted; and I think the cases which have been decided will be found to be so very similar and like to the one under consideration, that the decision on them must govern this; and further, that the question now presented has received so many determinations, that we must have departed not only from the known and familiar principles of law, but from determinations made under a law precisely similar to the statute of this state, so far as applicable to this

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

case, if we had come to a different result than the one we have made. We are aware, however, that the subject under consideration is one which is liable to be viewed too much on either side through the medium of feeling; and any judicial investigation of it may be regarded as treading upon forbidden ground. A decision one way may be regarded as promoting irreligion, licentiousness and immorality; and a decision the other way be considered as encroaching upon religious freedom. We shall endeavor, however, to inquire what the legislature have done, and give effect to their doings so far as we understand their requirements. The constitution of this state, (and herein it is a transcript from the first constitution of government established in this state) while it carefully protects and guards religious freedom, and asserts that the conscience of no one can be controlled, declares, "that every sect or denomination of christians ought to observe the Sabbath or Lord's day, and keep up some sort of religious worship, which to them shall seem most agreeable to the revealed will of God." To carry into effect the spirit of this constitution, to enable each religious sect to keep up religious worship on the Sabbath, and to enable all to enjoy the benefits to be derived from a day of religious retirement and rest, the legislature, among their first laws, made provision for the prohibition of secular labor on that day; and in the statute which they passed in 1779, and which has in substance been continued to this time, embraced all the provisions which are contained in the English statutes of the first and second Charles. Aware of the benefits to be derived from stated periods of rest from manual labor, of the importance of having the same day observed by all, and recognizing that every denomination of christians among them regarded the Sabbath as a day set apart for moral and religious duties, they determined that every one should be protected in the enjoyment of his religious privileges and in the performance of his religious duties, and have made provision that those who are thus disposed may on that day perform those great and necessary duties which they believe are required of them, without disturbance from the secular labor of others; and further, that all, whether high or low, prisoner or free, master or servant, shall be permitted to rest, and that none shall compel them to labor on that day; and lest through avarice or cupidity, any one should be disposed so to do, they have enacted that the day *shall* be observed as a day of rest from secular labor and employment, except such as

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

necessity and acts of charity shall require. Statute, p. 603. It may here be remarked, that wherever a statute inflicts a penalty for doing any thing, the penalty implies a prohibition, though there are no prohibitory words in the statute. This statute not only inflicts a penalty on those who violate it, by labor or recreation, but expressly prohibits all secular labor or employment, so that there is both an implied and express prohibition. The question will then arise, whether the employment of these parties, as detailed in the bill of exceptions, the sale, exchange, and contract of warranty, is a secular labor or employment, within the meaning of the statute, subjecting them to a penalty; and secondly, if it is, whether courts of justice are to lend their aid to carry into effect a contract made in violation of a positive statute, and for the making of which they would inflict a penalty or fine on the parties thereto?

On the first question there can be no doubt. All will readily answer in the affirmative. It was not only a secular labor or employment, but one directly calculated, from the nature of the business, to disturb the devotion of others, and to interrupt the rest and quietness which all have a right to enjoy on that day. On the second question, it is apprehended that the law, as established in analagous cases, and under statutes similar in their provisions, furnishes as ready an answer in the negative. It is an acknowledged principle of law, that a court will not lend its aid to carry into effect a contract made in contravention of a positive statute, particularly if the statute was made for the purpose of protecting the public, for promoting peace, good order, or good morals. The reason for this is sufficiently obvious without recurrence to authorities. There would be a great inconsistency in a court of justice, to inflict a punishment on persons for making a contract, which disturbed the public peace and contravened a statute, and in the next cause settle the terms of that contract between the same parties, inquiring whether it had been fulfilled, and giving damages to the one or the other for not fulfilling it. It would be altogether more consonant to propriety to tell the parties to such an illegal transaction, that they are not to come into a court of justice on any question in relation to such a transaction, except to receive judgment for the penalty they have incurred by disregarding the law.

The authorities to this effect are numerous, both in England and in this country. A few of them only will be noticed. In the case of *Bartlett* vs. *Vinor*, Carth. 252, and also Skinner

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

322, it was said that in case of simony, although the law only inflicted a penalty, and does not mention any avoiding of the simoniacal contract, yet it has always been held that such contracts, being against law, were void. By a statute in England, it is illegal for any candidate at an election to furnish provisions to voters, and it was held that an action could not be maintained by an inkeeper against a candidate for provisions furnished for that purpose at his request. *Ribbans* vs. *Cricket and al.* 1 Bos. & Pull. 264. By a statute in that country all bricks made for sale shall be of certain dimensions, and a sale is prohibited under a penalty. It was held that if bricks be sold under that size, the seller could not recover the value. *Law* vs. *Hodgson*, 2 Camp. 147, and also 11 East. 300. Brewers are prohibited by a statute from using any thing but malt and hops in the brewing of beer. A druggist was not permitted to recover the price of certain drugs, sold to a brewer, knowing they were to be used in a brewery. 1 Maule & Selwyn, 593, *Langton and others* vs. *Hughes and others*. A printer was not permitted to recover, either for his labors in printing a pamphlet or for materials found, when he omitted to affix his name and the place of his abode, in pursuance of the directions of the statute. 39 G. 3 c. 79 and 27. One of the judges (Bayley) observed that the omission was a direct violation of the law, that the public have an interest that the thing shall not be done, that the objection against the plaintiff's recovery must prevail, not for the sake of the defendant, but for that of the public. *Bensley and another* vs. *Bignold*, 5 Barn. & Ald. 335. In Pennsylvania a penalty is inflicted on any one who sells lands under the Connecticut title, but the statute contained no prohibitory clause; yet it was held that a contract for the sale of lands in that state under that title was unlawful and void. 1 Binn, 110, *Mitchell* vs. *Smith*. In New York a statute prohibited, under a penalty, the sale or purchase of tickets in any lottery not authorized by the legislature; and it was there held that no action could be maintained on a contract for the sale of tickets in a lottery not there authorized. *Hunt and others* vs. *Knickerbacker*, 5 Johnson, 327. In Massachusetts a statute prohibits the sale of shingles under certain dimensions, or if not surveyed, and makes both the buyer and seller liable to a pecuniary penalty for a violation of the statute. Under this statute it was held that no action could be maintained on a note the consideration whereof was a quantity of shingles sold not

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

of the size prescribed by the statute. *Wheeler* vs. *Russell,* 17 Mass. Rep. 258. In the case of *May & Co.* vs. *Brownell,* 3 Vt. Rep. 463, the same principle was recognized. These cases, which are selected from a multitude of others, are sufficient to establish the general principle, and it may not be out of place to notice the strong and emphatic language made use of by the different judges on this subject, to show how clearly the principle is recognized and established. Lord Mansfield says, "No court will lend its aid to a man who founds his cause of action upon an illegal or immoral act. If the cause of action appears to arise from the transgression of a positive law of this country, the plaintiff has no right to be assisted. It is upon this ground the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff." Cowper, 343. "The court will not interfere to assist either party, according to the well known rule that, *in pari delicto, &c.*—not that defendant's right is better than plaintiff's, but they must draw their remedy from pure fountains." Douglass, 468. Eyre, chief justice, in the case before cited from 1 Bos. & Pull, says, "How shall an action be maintained on that which is a direct violation of the public law? The contract is bottomed in *malum prohibitum* of a very serious nature, as appears by the preamble of 7 & 8 W. 3, c. 4. How then can we enforce a contract to do that very thing which is so much reprobated by the act? Persons who engage in this kind of transaction must not bring their case before a court of law." 1 Bos. & Pull, 266, Lord Alvanly says, "No man can come into a British court of justice to ask the assistance of the law, who founds his claim upon a contravention of the British laws." 3 Bos. and Pull, 38.

In *Law* vs. *Hodgson,* 2 Camp. 148, Lord Ellenborough says, "The plaintiff, in making the brick in question, was guilty of an absolute breach of the law, and he shall not be permitted to maintain an action for their value." And again: "The best way to enforce an observance of the statute was to prevent the violation of it from being profitable." Ashurst, J. "No right of action can spring out of an illegal contract." 8 Term. Rep. 89. Lord Ellenborough: "It may be taken as a received rule of law—that which is done in contravention of the provisions of an act of parliament cannot be made the subject of an action." Best, J.—"There is no illegal contract on which an action can be founded, inasmuch as the thing was done in

RUTLAND,
*January,*
1834.

Lyon
*vs.*
Strong.

direct violation of the law;" and in the same case he says, "It is equally unfit that a man should be allowed to take advantage of what the law says he ought not to do, whether the thing be prohibited because it is against good morals, or whether it be prohibited because it is against the interests of the state." From the principle of law thus clearly defined, and too often mentioned without any expression of doubt to induce us to believe it has ever been questioned, it would follow that if the contract under consideration was made in violation of the statute, and subjected the parties to a penalty, it could not be the subject of an action at law; that although both parties may be equally culpable, yet the maxim, *in pari delicto*, should prevail, and the court should refuse to aid the plaintiff, not for the sake of the defendant, but because his claim grows out of a transaction prohibited by law. On the question itself in relation to contracts of this kind, made on the Sabbath and under a similar statute, the authorities are clear and decisive. The statutes which have been passed in this state are very similar to the English statutes. Yet the terms made use of are more extensive and embrace a greater number of cases. The statute of Car. 1st, like our statute, prohibits all sports, pastimes, games or plays, although it does not prohibit labor. The statute of Car. 2nd contains all the provisions of the former statute, and further provides that no tradesman, artificer, &c. shall do any worldly labor, or works of their ordinary calling, upon the Lord's day. Our statute is, that no person shall exercise *any* secular labor, business or employment. Statute, p. 603. By the statute of Charles, it is to be observed, it is the labor or work of the ordinary calling of the person which is prohibited. Hence the attention of the courts in that country has often been called to the question, whether a contract or sale was made in the *ordinary calling* of the vendor, and doubts have been expressed at times whether the statute extended to private sales as well as public. These doubts, however, all vanished when the subject was fully investigated. The first case which I shall notice was that of *Drury vs. Defountain,* 1 Taun. 131. The plaintiff had sent his horse to an auctioneer, who sold him on Sunday to the defendant by private contract. In an action for the price of this horse the court held that the auctioneer was not in the exercise of his ordinary calling when he sold the horse by private contract; and therefore, as neither the plaintiff

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

nor his agent were in the exercise of their ordinary calling, the sale was not void by common law or by the statute, the court say it is to be lamented that the sale must be held good, and say expressly, that if any man in the exercise of his ordinary calling should make a contract on Sunday, that contract would be void ; that is, as was afterwards explained, void so far as to prevent a party privy to it from sueing it in a court of law.

The next case in which the subject was considered, was *Bloxsome* vs. *Williams*, 3 Barnwell & Cres. 232. This case went off, on the ground that the contract was not made on Sunday. Justice Bayley, however, intimates an opinion that the statute only applied to work visibly laborious, and did not extend to private sales. He says, however, that if it was within the statute, the plaintiff might be deprived of any right to sue upon a contract so illegally made. In the case of *Fennel* vs. *Ridler*, 5 Barn. & Cres. 406, which was an action on the warranty of a horse, the court decided that the purchase of a horse, by a horse dealer, was in the exercise of the business of his ordinary calling ; that the statute extends to private as well as public sales, and that the plaintiff could not maintain any action upon a contract for the sale and warranty of a horse, made by him upon Sunday ; and Mr. Justice Bayley observed, that though he expressed doubts in the case of *Bloxsome* vs. *Williams*, whether the statute extended to private sales, he was satisfied upon further consideration that it would be a narrow construction of the act, and a construction contrary to its spirit, to give it such a restriction. During the same summer, a case came before Chief Justice Best, at *nisi prius*, in an action on a breach of a contract for the purchase of nutmegs. The same questions were made in that case, which had been urged before in other cases—to wit, that the sale was not complete, and that it was not in the exercise of his calling. The Chief Justice, after intimating his opinion that these questions had been decided too narrowly, decided that the contract was void, having been made on the Sabbath.—2 Can. & Payne, 544. The cause was carried up to the court of common pleas in Hilary term, 1827, and the decision was confirmed by all the members of the court. Park, J., said that he did not think the decision of the court in *Drury* vs. *Defountain*, 1 Taun. 131, was right ; that the construction put upon the statute was too narrow ; and Ch. J. Best, with that promptness, firmness and energy, which is always to be admired in his opinions, says,

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

" I do not say that the mere inception of a contract on Sunday will avoid it, if completed the next day; but if most of the terms are settled on Sunday, and the mere signatures deferred to the next day, such a contract could scarcely be supported." This point, however, was not decided; for he says, " Here the whole was in effect complete on the Sunday, and unless it be permitted to a party to profit by a contract in defiance of the law of the country, the plaintiff cannot recover."—*Smith* vs. *Sparrow*, 4 Bing. 84.

In Connecticut it is said by Judge Gould, that the execution of written instruments on Sunday, between sunrise and sunset, have always been holden as falling within the description of secular business and been adjudged void under the statutes of that state.—2 Conn. Rep. 560. There is a case reported in Croke Eliz., *Comyns* vs. *Boyce*, where it is said that a fair holden upon Sunday is well enough, although by the 27 Hen. 6, c. 5, there is a penalty inflicted upon the party that sells upon that day, but it makes it not void. Upon that case, however, if it had not been overruled, it might be remarked, it was not a decision under the statute of Charles the second. The statute of Henry the sixth only prohibited fairs or markets on certain Sundays, (the four Sundays in harvest excepted,) " on pain to forfeit the wares so showed, to the lord of the franchise." Before the establishment of the Protestant religion in England, fairs, markets, sports and public sales, were usual on the Sabbath, and fairs being held by prescription, could only be held on the usual days, according to the calendar, whether Sunday or not. For that reason the statute of Henry the sixth has been called a very singular statute, as altering the course of prescription. Moreover, it has been decided that the case from Croke. Eliz. is not now law, that the law has been since changed, that now if any act is forbidden under a penalty, a contract to do it is now held void.—1 Taun. 136. In the case of *Geer* vs. *Putnam*, 10 Mass. Rep. 312, it was decided that a note dated on Sunday might be recovered. It is very evident, however, that the question was not much considered, so as to entitle it to great weight as an authority, if it should be found to conflict with other cases decided. The counsel for the party who made the defence gave it up in argument, and the decision was made on the authority of a case which had been decided in another county, but not reported. Possibly, however, the decision may stand without conflicting with the cases which

Rutland,
January,
1834.

Lyon
vs.
Strong.

have been mentioned. A note dated on the Lord's day might be for a consideration recognized as valid, as for acts of necessity or charity, and the party who would avoid it might be required to furnish some other evidence of its being a contract contrary to the statute than what might be inferred from the date of the note alone.

The whole current of authorities being in favor of the decision made by the county court in this case—and I confess I have always been satisfied with the reasons given in the cases report- ed, and think that the consequence follows irresistably from the statute, that no action can be maintained on a contract made in violation of the statute—it becomes our duty to declare the law as we find it, without regard to consequences. We have not, however, kept out of view the arguments which might be urged against this view of the statute. It is said that it will enable a party to take advantage of his own wrong. It is so in all cases of the violation of a statute, when the maxim, *in pari delicto*, is applicable. It is also said that it is difficult to decide what cases come within the statute, that there will always be doubts upon the construction of the statute, as to what are works of necessity or charity. To this it may be answered, that if the statute is not sufficiently explicit, it is competent for the legislature to make it more so ; but surely it is no reason why we should not apply it to a case plainly within its letter and spirit, because a case may arise of which there may be some difficulty in determining upon its extent. I cannot, how- ever, apprehend the least danger on this head. It is a law as easily observed as any in the statute book, and those who do not violate its precepts will suffer no inconvenience from its provisions ; while those who do, have only to blame themselves. They cannot call on a court to disregard a positive statute for the accommodation of those who are disposed to violate it. It is not for us to endeavor to anticipate all the consequences to result from an adherence to the statute. In a case of *Williams* vs. *Paul*, 6 Bing. 673, decided after the causes before men- tioned, it was determined that where a drover sold some cows on Sunday at a stipulated price, and the purchaser afterwards promised to settle, he might recover on a *quantum meruit* for the value of the cows, though not for the stipulated sum, on the ground of the after promise. Possibly in a similar case the parties abiding by a sale or exchange might be considered as so far ratifying it as to furnish ground of recovery on an

RUTLAND
January,
1834.

Lyon
vs.
Strong.

*indebitatus assumpsit*, if the court would not have to enforce the contract made on the Sabbath. This, however, is not now before us. People must observe and obey the laws and statutes of the state, and in cases which may arise hereafter, the courts of justice will undoubtedly decide according to the circumstances of each case, so as to carry into effect the statute and see, that it is not made an instrument of fraud or injustice. It is to be remarked, that we do not decide that a contract or proceeding of this kind, made wholly after the setting of the sun on Sunday, would be void. A contract at that time is not prohibited by the statute. Nor do we decide that a horse trade or any other of a similar character, commenced on Sunday and continued until after the setting of the sun before completed, would be valid. My present opinion is, that if a trade of this kind was commenced during the day, attended with the usual circumstances, riding about, jockeying, chaffering about terms, and thus continued until it ended in a trade, and was one continuous dealing, that it would not be out of the statute, because it was completed a few minutes after sundown. This, however, it is not necessary to decide in this case. We only determine, that when there is a sale or exchange of horses made on Sunday, and a contract of warranty thereon, no action can be maintained on such warranty, it being a violation of the statute of this state.

I have examined this subject more at length than I otherwise should, as the court are not all agreed in the result. Judge Mattocks dissents. The judgment of the county court is affirmed, and as the plaintiff became nonsuit, he can commence another suit, if he can by his testimony take the case out of the statute.

MATTOCKS, J., *dissenting*.—It is always with distrust that I entertain an opinion different from my brethren, and with diffidence that a dissent is expressed. Being fearful that the principle necessarily involved in the decision that has just been made in this cause will not prove salutary, and it being an innovation upon what has heretofore been considered the law of the land, I deem it proper to express the reasons that lead me to a different conclusion from a majority of the judges present.

This decision, upon the face of it, goes no greater length, than that a contract for swaping horses, made on the Sabbath, cannot be enforced in a court of justice. This as an insulated

Rutland,
January,
1834.

Lyon
vs.
Strong.

position would receive my most cordial assent, as such a transaction is most shameful in any christian community. But when it is considered, that the law is a rule comprehending all cases of a similar description, and that the rule cannot bend to the case, but the case must yield to the rule; it follows, I suppose, of course, agreeably to the analogy of the law, according to this decision, that no recovery can be had upon contracts in general made upon the Sabbath. And to this there might be no objection in point of justice, as to contracts wholly executory; for this would leave the parties as they were; but as to contracts wholly executed on one side, as when cash or other property is delivered, and a contract taken to build a house or deed a farm, until the courts can devise some consistent mode of making the receiver disgorge, and thereby place the parties *in statu quo*, it seems to me the effect of this decision will be to permit a fraudulent party to violate a principle that is older than the Sabbath, and in the New Testament better defined and much more frequently enjoined than the observation of that holy day—eternal justice; and surely those who will profane the Lord's day should have no restraints removed that tend to prevent their defrauding the unwary. Still the inquiry is, what is the law applicable to the question? For if that is clear, there is no room for judicial policy. At common law it is believed there was no distinction as to contracts, between Sundays and week days. The national church had their holy week before Easter. But whether the Lord's day was considered holy, and the profanation of it was left to be punished by ecclesiastical censure, I do not distinctly know. If we were to judge from the writings of Paley, who was an arch-deacon in the established church, and some part of whose works at least are so respectable that they are a classic in our colleges, it would seem not; for he argues that the Sabbath was originally given to the Jews only, and that there is no precept for changing it from the seventh to the first day of the week, and the example in the New Testament is only of meeting to worship on the first, and therefore is no further binding on christians. In *Drury* vs. *Defontaine*, 1 Taunt. 130, Best, Sergeant argued that no canon, no opinion to be found in any writers upon ecclesiastical law, treats bargains made on Sunday as illegal. The Jewish law prohibited them, but several of the councils have expressly declared that christians shall not judaize; and this was not contradicted. In *Comyns* vs. *Boyer*, Cro. Eliz. 485,

it was ruled, "that a fair holden on Sunday is well enough, for although by the statute of 27th Hen. 6th, there is a penalty inflicted by the party who sells on that day, it does not make it to be void." And before this statute fairs were commonly holden on a Sunday, and Ch. J. Mansfield said, "that as business fairs were made by prescription and could not be held on any other days than those on which they had been immemorially held, and that is a very singular statute, for it alters the course of a prescription." In McCulley's case, Cro. Jas. 279, it was resolved that an arrest made on Sunday was good, and McCully was executed for killing the officer who made the arrest on that day, it being before the statute of Charles II. In *Waste vs. the Borough of Stoke*, travelling is allowed to be lawful; that a writ bearing teste on Sunday is good, and that the chancellor may seal writs on patents on any day. And in *Rex vs. Bretherton*, 1 Strange, 702, an indictment at common law, not concluding against the statute for selling meat on Sunday, was held bad on demurrer; and indeed Ch. Just. Mansfield declared, "It does not appear that the common law ever considered these contracts void that were made on Sunday." It may, I believe, be considered as clear, that in England it is only the statute of 29th Charles II. that has occasioned any question. Under that statute it was always decided that the service of any process on Sunday was bad, for the plain reason that the statute says, "that the service of every such writ shall be void to all intents and purposes." The other clause of the statute says, "That no person whatever shall do or exercise any worldly labor, business or work of their ordinary callings upon the Lord's day." This part of the statute slept, for any case that I have seen, from the 27th Charles II. to the 48th of George III., before any attempt was made under it to impeach a contract.

There is then the case before cited, of *Drury vs. Defontaine*. This defence was set up against the recovery of the price of a horse sold on the Sabbath, and the court decided that a "sale of goods made on a Sunday, which is not made in the exercise of the ordinary calling of the vendor or his agent, is not void at common law nor by the statute of 29th Charles II." The next case was *Bloxom vs. Williams*, 10 C. L. R. 60. This was assumpsit for breach of the warranty of a horse, and Bayley, J. who delivered the opinion of the court, approves of the decision in the last case, but doubted whether the statute applied at all to a bargain of this description, and "inclined to

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

RUTLAND,
*January,*
1834.
——
Lyon
*vs.*
Strong.

think that it applied to manual labor and other work visible and laborious, and the keeping of open shops." The case was decided for the plaintiff, on the ground that the contract was not finished on Sunday, and also that the purchaser did not know that the seller was a horse dealer. Then came the case of *Fennel et al.* vs. *Ridler,* 11th C. L. R. 261. This also was an action for the sale and warranty of a horse. The plaintiff was a horse dealer, and the contract was made on Sunday ; and here the court for the first time decide that no action can be sustained on such contract. And Bayley, J. who again delivered the opinion of the court, said his doubts were entirely removed, and gave the act the construction he formerly intimated it would not bear. He quotes no decided case to support his opinion, but cites a dropping of Ch. J. Mansfield, in *Drury* vs. *Defontaine,* as to his view of the statute. He says also, " that it does not indeed apply to all persons, but to such only as have some ordinary calling." Next was *Smith* vs. *Sparrow,* 12 C. L. R. 253. This was assumpsit upon a contract for the purchase of a quantity of nutmegs, tried before Best, Ch. J. The defence was, 1st. Statute of frauds ; and 2nd. That the contract was made on Sunday. The judge was for defendants on both points. On the second point the judge said, " There are different opinions on that point. I think the question has been decided too narrowly. I should have considered, that if two persons act so indecently as to carry on their business on a Sunday, if there had been no statute on the subject, neither should recover." The points were saved and argued at the full bench, and the decision of the court is concise. They only say, "The court were of opinion that the decision at *nisi prius* was right upon both the points, and therefore they discharged the rule." Then was *Smith* vs. *Sparrow,* 13th C. L. R. 351, where it was decided that an action will not lie on a contract entered into on a Sunday, although entered into by an agent, and although the objection is taken by the party at whose request the contract was entered into. And Park, J. says he thinks the expression, " any worldly labor," cannot be confined to a man's ordinary calling, but applies to any business he may carry on, whether in his ordinary calling or not. Lastly, the cause of *Williams* vs. *Paul,* 19th C. L. R. 193. The case was, a drover sold some cattle to an innkeeper on the Sabbath, and he not paying for a heifer, defendant was sued. The defence was, contract on Sunday ; but the

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

defendant had eaten the beef, and the court were staggered at the injustice of the defence.   But the same judges, (and they alone, I believe) had sustained such defences ; and they held that defendant, having kept the heifer, was liable at all events on the *quantum meruit;* and the plaintiff having proved that defendant had afterwards, on such a day, promised to pay, Park, J. said, " here it appears that the defendant kept the animal, and made a new promise to pay subsequent to the Sabbath, and his present refusal is not consistent with the practice of a very sincere christian !"

These are all the cases that I have seen in the English reports bearing upon this question, and to my mind they show that anciently in England, as in most countries in Europe, except perhaps Scotland, the Sabbath was considered a day for people to attend mass or church, and then to amuse themselves as they pleased, until some statutes were made forbidding particular transactions, as holding fairs on that day ; until, at last, in the tyrannical reign of Charles I., or the voluptuous reign of Charles II., (for the cases cited differ in the quotations of the statute, though most of them call it 29th Charles II., and I have no certain means of knowing which is right) the last and only important statute was passed on the subject, unless the late parliament have enacted the bill that was lately brought in. That act did pretend to prohibit all business on the Sabbath ; it was at most to prevent persons from laboring in their vocation, not touching noblemen and gentlemen, who do nothing by prescription.   This statute inflicted a small penalty of 5*d*, for the breach of it ; and during all the succession of great and profound judges that have graced the English bench, was never suspected to mean more than the penalty, until within a few years, one set of judges in one of the four superior courts in Westminster hall have contrived to put a new construction on that statute ; but have not settled the question, it appears, whether all contracts, or only those of a man's " ordinary calling," are void ; and in the last case cited, they incline to think that though the contract was void, the plaintiff might recover on a *quantum meruit.*   Yet Bayley, J. in *Bloxsome vs. Williams,* said, " If the contract be void as falling within the statute, then the plaintiff, who is not a *particeps criminis,* may recover back his money, because it was paid on a consideration that has failed."   This must be on the ground of an implied

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

contract. On this ground implied contracts are raised from dealings on Sunday, as of any other day, but express ones void— leaving the parties to revoke as to the terms of the bargain, and opening an additional topic of dispute about the price or value. And in the same case they seem to hold that a new promise afterwards, on a week day, would be binding; upon what known principle we are not informed. In what case is a contract, originally unlawful and void, made. lawful and valid by a subsequent naked promise?

I infer from reading these late cases, that the judges, in some horse dealing cases which came before them, being struck with the scandalous nature of such transactions upon the Sabbath, hastily put a moral construction upon the statute that was unwarrantable by law. But in the last case of the heifer, where they saw the gross injustice that their own decisions would lead to, they were obliged to halt and make a lame retreat, not by professedly retracing their steps, but by giving very loose and unsatisfactory reasons for saving that case from their own rule of construction of the statute; and as neither in the exchequer chamber nor house of lords, nor by the other superior courts, has any such decision been made as before quoted, I consider that at this moment it is not the law of England, that contracts in general made on Sunday are void.

I come now to our statute. The last clause of the preamble says, " To the end, therefore, that the good people of this state may be enabled, as well on that day (Sunday) as on all proper occasions, freely and without disturbance, to perform those great and necessary duties (public worship) with that decency and solemnity which is suitable to their importance." Therefore it is enacted, " That no person shall exercise any secular labor, business, or employment, except such as necessity and acts of charity require," under a penalty of two dollars. The second section inflicts a penalty of not over forty dollars for disturbing public worship, Sunday or week-day; and the seventh section limits all prosecutions to thirty days. It is argued, that as this statute makes all secular business unlawful, the general principle applies, that no action can be founded on a contract prohibited by law; because the prohibition makes the act or business unlawful, and the contract about that unlawful business is unlawful. Of course, perhaps this is correct, where a specific act is prohibited by statute. That clause of the statute of Charles the II. that declared it unlawful to serve

RUTLAND,
January,
1834.

Lyon
vs.
Strong.

legal process on Sunday, was from its passage construed to make all such service perfectly void, and placed all concerned as if there was no writ; and modern cases probably are, that actions cannot be supported on contracts growing out of acts made unlawful by a statute, as the case read from Mass. Rep. and others. But there are no other statutes any where, save the Sabbath acts, that prohibit all business transactions or contracts on a given day or days; and so far as I know, when our act was passed, there was no intimation in any law book, English or American, that all contracts made on that day were void. And the main object of the act, as appears by the preamble, was, to enable the people, without disturbance, to attend public worship, and every justice of the peace was allowed to give permits to travel with "teams and droves" on the Sabbath, and the penalty for any breach was "not exceeding two dollars," and this limited to a prosecution in thirty days; and the first clause of the third article of the constitution seems intended to secure religious freedom. In *Smith* vs. *Sparrow*, Park J. says, "The common law is founded on our holy religion, and no law can be good which is not;" and other judges there often express the same sentiment. Hence their national church, their tithes, and their requiring the officers of government to partake of the sacrament. Whether religion is a safer basis to found a government and the laws upon, than liberty and the voice of the people, it is not for us to decide. But it is well known, that our government and laws are not founded upon religion, as we have no test or standard of belief by law established; and because our government, they believe, is not founded upon the word of God, a portion of the Scotch emigrants in this State, although they submit to, yet refuse to qualify and vote, or participate in the government, and have made several unsuccessful attempts, before different councils of censors, to have the constitution amended in this particular. Could it then have been the intention of the legislature, in 1797, when this act was passed, to visit with such tremendous consequences all classes of christians, jews and gentiles, as to make all contracts void, and thereby inflict the greatest injustice upon the least guilty of the practice, by allowing the most guilty, who adds dishonesty to his profanation, to escape with his ill-gotten gains. I think the silent but significant construction of the act for forty years proves most potently that this was not their intention. If the penalty in the act is too trifling to suppress the evil, let

RUTLAND,
*January*,
1834.

Lyon
*vs.*
Stiong.

a more adequate one be inflicted by the legislature; but let the penalty fall equally on those equally guilty, and let it go to the public, like other fines, and not in effect to him who is at least *particeps criminis.* Besides, there will be, I apprehend, other practical difficulties growing out of the decision. The statute excepts all acts of necessity and charity. These are lawful, and who is to judge what are such? If the jury, it will depend on the religious opinions of each jury, and of course be pregnant with the utmost uncertainty. If the court decide as matter of law, then it will nearly convert a bench of laymen into an ecclesiastical council; for "necessity and charity," in connexion with the Sabbath, must very much depend upon the creed or religious belief of the individual to whom the question is submitted. Although the holy-observance of the Sabbath is a positive duty, yet like charity it is undefined; and different denominations of christians even, as well as individuals, vary much in the degree of strictness with which it ought to be observed; and though an admitted duty, yet the manner of its observance is perhaps described with less certainty than almost any other gospel requirement. How ungracious then for a court to mark the law upon this duty for all denominations to be governed by, and with judges usually belonging to different religious societies! It would be like a synod composed of the dignitaries of several sects. Unanimity could scarcely be expected. And if it was to be regarded as a mixed question of law and fact, it still would be a vexed one, as the propensities for travelling on Sunday have formerly shown, when scarcely two justices or two juries would agree upon the validity of an excuse, or what constituted a necessity for travelling. So much confusion was there upon the subject, that it is believed most pious people think that prosecutions do religion more harm than good, and suppose the question of what was necessity or charity was to be decided independent of sectarian views. How extremely embarrassing many cases would be. For instance: a man borrows a considerable sum of money on the Sabbath. It was perhaps to pay a debt at a distance on Monday and save a bill of cost; to redeem a mortgage and save an estate, or be so represented, but it was not so. Another sends to a butcher on Sunday for meat. Are these matters of necessity? Or should the money have been procured before? Or if it was expected and the person disappointed, will that be an excuse? Or if he lied to the lender, will that be as if necessity existed?

Should the meat have been prepared on Saturday, like the manna? And how difficult to arrive at all the facts and motives. And what cases shall *per se* be adjudged necessary or charitable? How with marriage, the greatest of all contracts here among protestants? It is no sacrament or other religious rite, but a mere civil contract. Is this void or voidable, or does it come under the saving clause?

Finally, I believe with the pilgrims, that the Sabbath was given to the whole world, and not to the jews exclusively; and that in the New Testament, by fair inference, if not by express command, it was changed to the first day of the week, and that its observance is commanded in the Old and inculcated in the New Testament. Yet I believe to adjudge contracts void made on that day will not tend to the better observance of the day; that neither the common nor statute law, nor any former decisions in this state authorize, nor does sound policy require, the decision which my learned brethren have made in this cause, from the best of motives most certainly. But for myself I am not able to view the subject as they do; and I hope it is not for lack of respect for religion, or its institutions; for I believe with the Scotch covenanters, in my own neighborhood, that the law as well as a man " may like the kirk well enough without riding in the rigging."

Upon the whole, I most respectfully dissent from the opinion of the court in this case.