# Chittenden Town School District and Cynthia Andrews, et al., Intervenors v. Department of Education and Elizabeth Sojourner, et al., Intervenors

[738 A.2d 539]

No. 97-275

Present: Dooley, Morse and Johnson, JJ., and Allen, C.J. (Ret.) and Gibson, J. (Ret.), Specially Assigned

Opinion Filed June 11, 1999

John A. Facey, III of *Reiber, Kenlan, Schwiebert, Hall & Facey,* Rutland, and *William H. Mellor, III, Clint Bolick* and *Richard D. Komer,* Institute for Justice, Washington, DC, for Plaintiff-Appellant.

*William H. Meub* and *Orland Campbell, Jr.,* of *Keyser, Crowley, Meub, Layden, Kulig & Sullivan, P.C.,* Rutland, for Plaintiffs-Intervenors-Appellants Cynthia Andrews, et al.

*William H. Sorrell,* Attorney General, *Mark J. Di Stefano,* Assistant Attorney General, and *Paul C. Fassler* and *Karen L. Richards,* Special Assistant Attorneys General, Montpelier, for Defendant-Appellee.

*Mitchell L. Pearl* of *Langrock Sperry & Wool,* Middlebury, and *Joel D. Cook,* Vermont-NEA, Montpelier, for Defendants-Intervenors-Appellees Elizabeth Sojourner, et al.

*A. Jeffrey Taylor,* Rutland, *Martin S. Kaplan* and *Stephen A. Jonas* of *Hale and Dorr LLP,* Boston, Massachusetts, and *Lisa Thurau,* New York, New York, for Amicus Curiae National Committee for Public Education & Religious Liberty.

**Dooley, J.** In this declaratory judgment action, we are again called upon to consider the constitutional implications of the Vermont statutes authorizing school districts to provide high school education to their students by paying tuition for nonpublic schools selected by their parents. See 16 V.S.A. §§ 822 and 824. In *Campbell v. Manchester Board of School Directors,* 161 Vt. 441, 641 A.2d 352 (1994), we concluded that the Establishment Clause of the United States Constitution was not an impediment to the reimbursement at public expense of tuition paid to a sectarian school in the circumstances of the case then presented. See *id.* at 447-48, 456, 641 A.2d at 356-57, 361 (overruling our prior holding to the contrary in *Swart v. South Burlington Town Sch. Dist.,* 122 Vt. 177, 167 A.2d 514 (1961)). Today we confront a question explicitly reserved in *Campbell,* see *id.* at 447-48 n.5, 641 A.2d at 356 n.5: whether the tuition reimbursement scheme transgresses the Compelled Support Clause of the Vermont Constitution, Vt. Const. ch. I., art. 3, which speaks not to establishment of religion but to state support of religious worship. The superior court ruled in favor of the Department of Education and the intervenors aligned with the department, basing its analysis on the

federal Establishment Clause. We focus on the Vermont Constitution and conclude that a school district violates Chapter I, Article 3 when it reimburses tuition for a sectarian school under § 822 in the absence of adequate safeguards against the use of such funds for religious worship. Because of the absence of such safeguards in this case, we affirm the judgment of the superior court.

## I. Background

The case was submitted to the superior court on stipulated facts, which we summarize in relevant part. Plaintiff Chittenden Town School District has ninety-five students in grades nine through twelve. It does not maintain a high school for the education of these secondary students. Instead, it pays tuition to public high schools or approved independent schools for this purpose, as explicitly authorized by 16 V.S.A. § 822. Pursuant to §§ 822(a)(1) and 824(b), parents of the students may select an approved school to which to send their children.

Until the 1996-97 school year, the Chittenden School Board authorized tuition payments only for public high schools or approved secondary schools that it found to be nonsectarian. In the 1995-96 school year, it paid tuition for seventy-five secondary school students. Of these, seventy-two attended one of the five public high schools operating in Rutland County, and three attended approved private secondary schools.

In December of 1995, the Chittenden School Board adopted a new secondary-education tuition-reimbursement policy that would allow tuition to be paid to sectarian schools. One approved independent sectarian secondary school operates in Rutland County. That school is Mount Saint Joseph Academy (MSJ), a parochial high school located in the City of Rutland. MSJ is owned and operated by the Sisters of Saint Joseph, under the authority of the Roman Catholic Diocese of Burlington. MSJ is an institution in which the secular and sectarian aspects of its educational program are intertwined. Its statement of philosophy reveals that its academic program incorporates religious and moral education through a broad range of curricular and co-curricular activities and that "[w]e believe that learning occurs in an atmosphere where faith and community are emphasized and overtly practiced. . . ."

Consistent with its educational philosophy, MSJ requires instruction in theology, constituting four of twenty-three credits required for graduation. The four theology courses are entitled "Salvation Histo-

ry," "Sacraments," "Ethics" and "Commitment." The description of the theology curriculum at MSJ states:

> During a four year period, the development of spirituality is found through liturgy, prayer, retreat and experiential learning activities. . . . Through the historical and biblical study of our faith roots, presentations, and discussions on the Gospels and lives of Christian leaders, students build a foundation for the development of their individual spiritual lives.

Among the expected outcomes of the theology education and the religious life activities of the school are that the students will "witness a sense of Catholic identity" and will "continue to proclaim the Gospel of Jesus and work towards fulfilling the kingdom through service/ministry/action."

The MSJ school day begins with a prayer, to which all students are required to give quiet attention. Once a month, the entire school attends a celebration of the Roman Catholic mass led by a priest. Non-Catholics must attend, but are not required to participate in the sacrament. All students must attend annual spiritual retreats, which include prayers and a mass. All students must attend a twice-annual celebration of the sacrament of reconciliation; participation in the sacrament is not required.

MSJ faculty are required to adhere to Catholic doctrine in their teachings and must demonstrate and exemplify the values of the Catholic faith by striving to live and teach the Gospel messages of Jesus. The principal of MSJ is a Roman Catholic nun. Of the twenty-seven teachers, four are nuns or priests.

Although we have been required by the issue before us to examine the sectarian aspects of education at MSJ, we emphasize that the record indicates that MSJ is a very good high school. Ninety-one percent of MSJ's class of 1996 went on to college. In recent years, the percentage has been 83% to 93%. Of the 206 students enrolled in MSJ for the 1996-97 school year, 164 were Roman Catholics and the remainder were of different faiths.

In May 1996, the Chittenden School Board specifically approved payment of tuition to MSJ. Fifteen Chittenden students were enrolled in MSJ for the 1996-97 school year.

The Chittenden Town School District funds secondary education through a combination of revenues raised by the local property tax and aid to education received from the State of Vermont. For the

1996-97 school year, it intended to use $39,000 in public funds to pay tuition at MSJ. MSJ has a three-tiered tuition policy, charging $3,000 annually to non-Catholics; $2,775 to Catholics who reside in the Diocese, but not in the City of Rutland; and $2,525 to Catholics who reside in the City of Rutland. MSJ projected its per-pupil cost of education at $5,021 for 1996-97. The Diocese and local Rutland parishes would make up the bulk of the difference.

When the Chittenden School Board voted to allow tuition reimbursement to MSJ, the Commissioner of Education terminated state aid to education to the district. The Chittenden Town School District then brought this action against the Commissioner and the Vermont Department of Education, asserting, among other claims,[1] that tuition reimbursement to MSJ was constitutional and seeking an order to restore state-aid funding. Defendants counterclaimed that the Chittenden decision to make tuition payments to MSJ violated the Establishment Clause of the First Amendment to the United States Constitution and Chapter I, Article 3 of the Vermont Constitution. They also sought an injunction.

The superior court authorized two groups of intervenors. One group, aligned with plaintiff, consists of parents who are sending children to MSJ for secondary education and seek payment of the MSJ tuition by the Chittenden Town School District. The other group, aligned with defendants, consists of residents of the Town of Chittenden who oppose the use of their state and local tax payments to fund sectarian education.[2]

On October 17, 1996, the superior court entered a temporary order based on the stipulation of the parties. The temporary order prohibited the Chittenden Town School District from making any tuition payments to MSJ and required the Department of Education to continue to make state-aid-to-education payments to the district. On June 27, 1997, the superior court issued its opinion and order,

---

[1] The original complaint contained other claims, but these were dismissed with prejudice and neither plaintiff nor the intervenors aligned with plaintiff have appealed the dismissal. Plaintiff also claimed that defendants' actions violated the Religious Freedom Restoration Act. The superior court declined to address this claim because of the decision of the United States Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997), striking down this act. Plaintiff and plaintiff-intervenors have not raised the Religious Freedom Restoration Act on appeal.

[2] For the sake of convenience, we hereafter refer to plaintiff and the intervenors aligned with it collectively as plaintiffs, and to defendants and their aligned interveriors as defendants. We also note that MSJ is not a party to this case and thus cannot be required to "demonstrate that its curriculum does not involve the propagation of religious beliefs," as argued by the concurrence.

concluding that "tuition payments from a school district to pervasively sectarian high schools, or the parents of the children who attend, would have the effect of a direct subsidy to religious schools in violation of the United States and Vermont Constitutions." The court granted defendants' motion for summary judgment and continued the temporary order pending appeal. It held, however, that if this Court reversed its decision, it would order the State to reimburse the Chittenden parents for tuition already paid to MSJ.

Plaintiffs have appealed from the court's decision, contending that (1) tuition payment to sectarian schools does not violate either the United States Constitution or the Vermont Constitution as long it is based on a parent's free choice of educational provider, and (2) exclusion of sectarian schools from reimbursement violates the Free Exercise Clause of the First Amendment to the United States Constitution. Defendants have responded that Chittenden's tuition-reimbursement policy violates both applicable constitutions and that exclusion of reimbursement for sectarian schools does not violate the United States Constitution. Defendants have cross-appealed the superior court's decision to order tuition reimbursement in the event its main holding is reversed.[3]

As we analyze the dispute before us, we cannot but share the feelings of Chief Justice Williams of this Court, who in 1834 wrote the first decision interpreting Chapter I, Article 3 of the Vermont Constitution. The question was whether this Court would enforce a contract made on the Sabbath. Chief Justice Williams found that the question was clearly resolved by "principles of law which have been known, acknowledged, and never controverted," but added:

> We are aware, however, that the subject under consideration is one which is liable to be viewed too much on either side through the medium of feeling; and any judicial investigation of it may be regarded as treading upon forbidden ground. A decision one way may be regarded as promoting irreligion, licentiousness and immorality; and a decision the other way be considered as encroaching upon religious freedom.

*Lyon v. Strong*, 6 Vt. 219, 220, 221 (1834). Over one hundred and sixty years later, the background of this case is similar. We emphasize that this is not a decision about the value of religious education or of

---

[3] Because of our disposition of this case, we do not reach the cross-appeal.

education about religion. From what we can determine on this limited record, religious education is thriving in this state and providing a high quality education to many students. Nor is this a decision about the value of parental choice in determining where and how children will receive education services. Whether parental choice improves the quality of education for some or all students must be determined by the executive and legislative branches, not this Court. Our challenge is to apply legal principles derived from the Vermont and/or United States Constitutions to determine whether governmental payment for religious education is constitutional if parents have free choice to send their children to any approved educational institution, public or private, secular or sectarian.

## II. Overview of Statutory Scheme

Before reaching the constitutional questions, we find it helpful to look at the controlling statutes. The basic scheme is quite simple. Since the Chittenden Town School District provides elementary education, it is required to provide secondary education. See 16 V.S.A. § 822(a). It has a number of options in meeting this obligation. The two main ones are to maintain a public high school or to pay tuition "to an approved public or independent high school, to be selected by the parents or guardians of the pupil, within or without the state." *Id.* § 822(a), (b).[4] Chittenden has taken the second of these options.

The approval for public or independent high schools is given by the Vermont Board of Education. To become an approved independent school, the school must: (1) offer elementary or secondary education; (2) provide a prescribed minimum course of study; and (3) "substantially" comply with Vermont Board of Education rules for approved independent schools. 16 V.S.A. § 166(b). The rules must at a minimum require "that the school has the resources required to meet its stated objectives, including financial capacity, faculty who are qualified by training and experience in the areas in which they are

---

[4] The school district does have other options, not relevant here. For example, it can designate an approved independent school as its high school. See 16 V.S.A. § 827(a). It can join a union school district to operate a high school with other districts. See *id.* §§ 701-723. In certain circumstances, the district can maintain a high school and tuition some students to a public or private high school. See *id.* § 822(c).

assigned, and physical facilities and special services that are in accordance with any state or federal law or regulation. *Id.*[5]

Neither the statute nor the rules deal with sectarian education. As discussed below, the exact tuition reimbursement scheme adopted by the Chittenden Town School District became unlawful after this Court's decision in *Swart*, but:

> The Legislature took no action to implement that decision, leaving the school districts in the same position today as they were in 1961. Although the relevant statutes allow school districts to pay tuition on behalf of a resident who is a student in any approved private school, the districts must determine whether such a payment violates the Establishment Clause.

*Campbell*, 161 Vt. at 447, 641 A.2d at 356. Thus, neither the statute nor the rules deal with the religious part of the curriculum of a sectarian school. They impose no limit on the quantity and nature of sectarian subjects; nor do they require that sectarian education be separated from secular education. It is entirely possible that the majority of the education in an approved independent school will be in religious tenets and doctrine.[6]

Nor do the tuition payment statutes impose any real limits. The sending district must pay the full tuition rate of any independent school meeting public school standards. 16 V.S.A. § 824(b). If the independent school does not meet public school standards, the tuition payment for a high school student cannot exceed "the average announced tuition of Vermont union high schools for students in

---

[5] In addition to the requirements of the statute, the Board's rules require that the school: (1) offer a minimum course of study that is age and ability appropriate; (2) have support services — library, administrative, guidance and counseling services and a system of records to assess student progress — necessary to meet the requirements of a minimum course of study and the educational objectives of the school; (3) have classrooms, laboratory, library and other facilities necessary to operate its program; (4) have an adequate program of continuing professional staff development; (5) have a sufficient number of professional staff; (6) satisfy legal requirements on facilities, fire drill, and immunization of students; (7) maintain a register of daily attendance of each pupil and report enrollment according to law; and (8) maintain an operating schedule that includes a total number of instructional hours that are not less than those of a public school. Vermont Bd. of Educ., Manual of Rules and Practices §§ 2226.1-2226.11 (1997), reprinted in 3 Code of Vt. Rules 22000004-5 (1997).

[6] Of the sixty-five independent schools approved by the Vermont Board of Education, four are identified as "7th Day Adventist" schools and three are identified as "Christian" schools. Many of the remainder, like Mount Saint Joseph Academy, appear to be parochial schools.

grades 9-12 for the year" or such higher rate as is voted by the electorate of the sending district. *Id.* § 824(c). Although the term "tuition" is not defined, we see nothing in the statutory scheme to suggest that it is other than the rate charged by the approved independent school for whatever educational services it delivers. Thus, the cost of purely religious education can be included in the tuition payment made to a sectarian school.

We do not mean to suggest that our present inquiry implicates the ability of a sectarian school to charge tuition for religious education, rather than requiring that the cost of such education be borne by voluntary donations of religious adherents. This is a policy choice of the religious school. However, for reasons discussed fully below, we deem it highly relevant that, in the absence of any kind of regulatory process, the tuition payment system adopted by the Chittenden Town School District can, and presumably will, expend public money on religious education as long as some undetermined percentage of the money funds education on secular subjects required in the state's minimum course of study. The stipulated facts indicate that this is happening at MSJ. Apparently, the public and private sources of revenue are commingled so that each supports religious education.

In reviewing the statutory scheme, we are also making a point about the nature of this case. The factual record made by the parties shows, at best, some examples of how Chittenden's tuition reimbursement policy might be used, but the record also demands a broader inquiry. See *Robtoy v. City of St. Albans,* 132 Vt. 503, 504, 321 A.2d 45, 46-47 (1974) (function of declaratory judgment is to resolve "actual or justiciable controversy" involving results that are "reasonably to be expected"). The stipulated facts show that the Chittenden Town School District intends to pay tuition to any qualifying secondary school, sectarian or secular, selected by the students and parents. As it happens, the only sectarian school now selected by Chittenden parents and students is MSJ, but no party is suggesting that this decision will not govern if a student selects another religious school. Therefore, this case is not about MSJ or any other parochial school as such. We are called upon to decide whether a tuition reimbursement policy that allows tuition to be paid to *any* "approved public or independent high school" is constitutional, because the Department of Education may reasonably expect the Chittenden Town School District to reimburse tuition for all such schools. In examining the statutory scheme, we are therefore looking at which schools *could* meet the standards for this designation and receive tuition reimbursement if selected by parents and children.

## III. Chapter I, Article 3 of the Vermont Constitution

Defendants argue that the Chittenden tuition payment policy violates both the federal and Vermont constitutions, and the superior court accepted both claims. In *Swart*, this Court chose to analyze a virtually identical case under the First Amendment because the federal law was clear, and the Court was uncertain of the outcome under Chapter I, Article 3 of the Vermont Constitution. The federal law has become less clear. See, e.g., *Agostini v. Felton*, 521 U.S. 203, 209, 216-17 (1997) (overruling *Aguilar v. Felton*, 473 U.S. 402 (1985), and *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373 (1985), and holding that federally funded instruction at sectarian schools is permissible under Establishment Clause in at least some circumstances); see also *Simmons-Harris v. Goff*, 711 N.E.2d 203, 210 (Ohio 1999) (sustaining, in part, on Establishment Clause grounds a voucher program that includes sectarian schools); *Jackson v. Benson*, 578 N.W.2d 602, 620 (Wis.) (concluding that choice plan that includes religious schools does not offend Establishment Clause), *cert. denied*, 525 U.S. 997, 119 S. Ct. 466 (1998). But see *Strout v. Albanese*, 178 F.3d 57, 64-65 (1st Cir. 1999) (reaching opposite conclusion in context of tuitioning plan explicitly excluding parochial schools); *Bagley v. Raymond Sch. Dep't*, 728 A.2d 127, 135 (Me. 1999) (same).

■ We are the final judicial interpreters of the Vermont Constitution, see *State v. Read*, 165 Vt. 141, 153, 680 A.2d 944, 951 (1996), and our fundamental charter is a freestanding document. See *Hodgeman v. Jard Co.*, 157 Vt. 461, 464, 599 A.2d 1371, 1373 (1991). Therefore, as we pointed out in *State v. Badger*, 141 Vt. 430, 449, 450 A.2d 336, 347 (1982), when faced with a choice between deciding a constitutional case on state grounds — yielding a final answer in the form of "adequate and independent state grounds to support our judgment" — and a construction of the federal constitution that faces an uncertain future given the state of applicable federal principles, our duty is to choose the former course of action. "If our state constitution is to mean anything, it must be enforced where it is the only law capable of providing a final answer to a claim, and a party [who] . . . has invoked its protections." *Id.* Accordingly, we decide this case based solely on the Vermont Constitution and, since it is dispositive, need not consider whether the Establishment Clause of the First Amendment would also prohibit the tuition reimbursement policy at issue here.

Article 3 provides:

> That all persons have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God; and that no person ought to, or of right can be *compelled to* attend any religious worship, or erect or *support any place of worship*, or maintain any minister, *contrary to the dictates of conscience*, nor can any person be justly deprived or abridged of any civil right as a citizen, on account of religious sentiments, or peculiar mode of religious worship; and that no authority can, or ought to be vested in, or assumed by, any power whatever, that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship. Nevertheless, every sect or denomination of christians ought to observe the sabbath or Lord's day, and keep up some sort of religious worship, which to them shall seem most agreeable to the revealed will of God.

Vt. Const. ch. I, art. 3 (emphasis added). Defendants argue that Chittenden's tuition policy violates the Compelled Support Clause of Article 3. That is, the policy forces dissenting Chittenden and other Vermont taxpayers to "support [a] place of worship . . . contrary to the dictates of conscience." *Id.* Our decision must, therefore, turn on the meaning of the quoted language.

In construing our constitution, we have available a number of approaches in addition to our own precedents: examination of the text, historical analysis, sibling state constructions of similar provisions, and analysis of economic and sociological materials. See *State v. Jewett*, 146 Vt. 221, 225-27, 500 A.2d 233, 236-37 (1985). Like the First Amendment to the United States Constitution, Article 3 expresses two related, but different, concepts about the nature of religious liberty: No power may interfere with or control an individual's free exercise of religious worship, and no person can be compelled to attend or support religious worship against that person's conscience. We developed the meaning of the first concept in *State v. DeLaBruere*, 154 Vt. 237, 262-70, 577 A.2d 254, 268-72 (1990). Our cases have not significantly developed the meaning of the Compelled Support Clause.

## A. Prior Case Law

Although they do not resolve this case, we nevertheless find it helpful to examine the relevant precedents of this Court. See *id.* at 263, 577 A.2d at 268. Our first opportunity to interpret the Compelled Support Clause came in *Swart*, a dispute with facts virtually identical to those before us in this case. In *Swart*, a citizen of South Burlington, which did not then have a high school, sued to prevent the local school district from paying tuition to two nearby Roman Catholic secondary schools that were attended by South Burlington students. The trial court decided to analyze the case under the First Amendment because this Court had not previously construed Article 3. This Court agreed, noting that "the militant sense of freedom which directed [our] founders to be the first to write a prohibition against slavery . . ., was somewhat reserved in expression of religious liberty." 122 Vt. at 182, 167 A.2d at 517. It added that "[i]n the domain of religious liberty, the resolute history of the First Amendment seems the more demanding." *Id.* at 184, 167 A.2d at 518.

A related question is addressed in *Vermont Educational Buildings Financing Agency v. Mann*, 127 Vt. 262, 247 A.2d 68 (1968), where the chairman of the financing agency refused to issue revenue bonds and execute leases to construct a classroom building and science center for a Roman Catholic college in Rutland. In upholding the financing arrangement against challenges under both Article 3 and the First Amendment, the Court noted that Article 3 contains "no explicit injunction precluding assistance to sectarian education" and concluded that "[i]n this area, the limits of the First Amendment of the Federal Constitution are more restrictive," citing *Swart. Id.* at 269, 247 A.2d at 73. There was no violation of either constitution because "'[t]he mere fact that public funds are expended to an institution operated by a religious enterprise does not establish the fact that the proceeds are used to support the religion professed by the recipient.'" *Id.* at 270-71, 247 A.2d at 74 (quoting *Swart*, 122 Vt. at 184-85, 167 A.2d at 518).[7] The Court determined that the cause of religion would neither be served nor obstructed by the facilities to be constructed and financed, and that the lease and financing were constitutional. *Id.* at 271, 247 A.2d at 74.

In *Mikell v. Town of Williston*, 129 Vt. 586, 589, 285 A.2d 713, 715-16 (1971), the Court concluded that the proceeds from lease lands,

---

[7]We understand that the plain meaning approach taken by the concurrence would overrule the result of *Mann*. The decision held that the subsidy in that case did not violate Article 3; its holding on Article 3 was not dicta.

originally granted for church usage by the Royal Governor of New Hampshire and the State of Vermont, cannot be constitutionally paid by a town to the Episcopal Church. Although the plaintiff challenged the usage of the money under both the Vermont and the federal constitution, this Court relied solely on the federal constitution in holding that "[p]ublic subsidy of the dissemination of religious doctrine is unconstitutional." *Id.* at 589, 285 A.2d at 716.

Most recently, we confronted the question of public subsidies for sectarian education in *Campbell*. The *Campbell* decision is central to the parties' analysis of the current state of the federal law, but it does not discuss or apply the requirements of Article 3. Although the case was about local payment of tuition to attend a religious school, the issues were in a markedly different posture from those before us. In *Campbell*, the father of a secondary school student sought reimbursement for tuition he had already paid to an out-of-state Episcopal preparatory school. Pointing out the narrowness of our decision, we held that the Town of Manchester, which does not have a public high school and pays tuition to educate secondary school children, must reimburse plaintiff for the tuition. 161 Vt. at 442, 456, 641 A.2d at 354, 361. In reaching this decision, we emphasized the numerous circumstances that made the case unique: (1) the plaintiff had already paid the tuition so the town's payment would go to the parent and not to the sectarian school;[8] (2) the plaintiff did not live near a sectarian school, and there was no evidence that allowing tuition reimbursement would send any substantial number of children to sectarian institutions; (3) the sectarian school involved was out of state, and the regulation of the institution would not be affected by the ruling; and (4) because the out-of-state school could not meet Vermont public school approval standards, the reimbursement was limited to the average announced tuition of Vermont union high schools.[9] See *id.* at 452-53, 641 A.2d at 359-60. Under these circumstances, we held that reimbursement of the tuition would not offend the First Amendment. *Id.* at 456, 641 A.2d at 361.

---

[8]We stated that "direct payments to a sectarian institution may raise additional considerations" and did not address the validity of direct payment. *Campbell*, 161 Vt. at 452, 641 A.2d at 359.

[9]Because the plaintiff could receive only partial reimbursement for the tuition he paid, we noted that the "case shows a preference for public education." *Campbell*, 161 Vt. at 454, 641 A.2d at 360. We said that "[w]e leave for another day consideration of a case in which the reimbursement scheme might favor sectarian education." *Id.* at 455, 641 A.2d at 360.

Plaintiffs invoke this body of case law in support of their cause. They rely upon (1) *Campbell* and its analysis of federal law for the proposition that tuition payments to sectarian schools are constitutional as long as the schools are selected by the parents of the attending children, and (2) *Swart* and *Mann* for the proposition that Article 3 imposes no more constitutional restrictions than the First Amendment. On this basis, they argue that tuition payments to sectarian schools do not offend Article 3 as long as the parents choose the schools.

We are unable to draw the conclusion that a payment scheme that does not offend the First Amendment is necessarily consistent with Article 3. Whatever their interrelationship, the constitutional provisions are very differently worded. The First Amendment prohibits any "law respecting an establishment of religion." U.S. Const. amend. I. Article 3 prohibits coerced support for "any place of worship." Vt. Const. ch. I, art. 3. We are not dealing with "slightly variant phraseology" that can be easily reconciled. See *State v. Brean*, 136 Vt. 147, 151, 385 A.2d 1085, 1088 (1978) (discussing relationship between self-incrimination clause of Fifth Amendment to United States Constitution and Chapter I, Article 10 of the Vermont Constitution). As applied to the myriad of circumstances that might come before us, we do not believe we can simplistically state that one provision is always more restrictive of state action with respect to religion than another.

We also emphasize that the statements in *Swart* and *Mann* involved the Court's assessment of the state of federal law at the time. We believe that the *Swart* Court accurately analyzed and applied federal law as it then existed in the leading United States Supreme Court decisions of *Everson v. Board of Education*, 330 U.S. 1 (1947), and *McCollum v. Board of Education*, 333 U.S. 203 (1948). However we might predict the United States Supreme Court would rule today, we believe it would have affirmed *Swart* at the time for the reasons this Court found controlling. This controversy arises at this time because Chittenden believes that the United States Supreme Court would rule differently today. Broad and general statements comparing the meaning of our constitutional provisions to the meaning of federal constitutional provisions are not particularly helpful when the meaning of the federal constitutional provision changes through new court decisions. See *State v. Ely*, 167 Vt. 323, 330-31, 708 A.2d 1332, 1336-37 (1997).

We do not know how the *Swart* Court would have ruled if required to analyze the tuition-payment scheme under Article 3. We must now perform that analysis.

## B. Text of the Constitutional Provision

In performing this analysis, we turn first to the text of Article 3. The relevant language provides that "no person ought to, or of right can be compelled to . . . support any place of worship . . . contrary to the dictates of conscience." Vt. Const. ch. I, art. 3. The meaning of some parts of the language is not disputed. No party disputes that the language creates a self-executing prohibition, see *Shields v. Gerhart*, 163 Vt. 219, 224, 658 A.2d 924, 928 (1995) (constitutional provision is self-executing "'if it supplies a sufficient rule by means of which the right given may be enjoyed and protected'") (quoting *Davis v. Burke*, 179 U.S. 399, 403 (1900)) (quoting Cooley, Constitutional Limitations 99 (1883)), although they disagree about the nature of that prohibition. No party disputes that "support" includes financial support through the payment of taxes.[10] Finally, no party disputes that the phrase "contrary to the dictates of conscience" refers to the conscience of the person who provides support and that this element is met if compelled support for a place of worship offends the religious beliefs of the supporter.

The disagreements come in two places. First, plaintiffs argue that a school, however sectarian, is not a place of worship as that term is used in Article 3. Second, they assert that the intent behind the language was to prohibit state-sponsored religious institutions — that is, a state establishment of religion — and there is no state sponsorship here because the parents, not the school district, chose the religious school.

■ At the outset, we can narrow the first disagreement about the meaning of Article 3. We do not read defendants as claiming that any

---

[10] Numerous courts have held that payment of taxes is the equivalent of "support." For example, the Illinois Supreme Court paraphrased the provision as prohibiting the obligation to "contribute" to religious worship. *Reichwald v. Catholic Bishop of Chicago*, 101 N.E. 266, 267 (Ill. 1913). Relying on compelled-support language, the Virginia Supreme Court struck down a scheme that financed the education of certain students in sectarian schools because it "compels taxpayers to contribute money for the propagation of religious opinions which they may not believe." *Almond v. Day*, 89 S.E.2d 851, 858 (Va. 1955).

This point distinguishes this case from the recent decision of the Arizona Supreme Court in *Kotterman v. Killian*, 972 P.2d 606 (Ariz. 1999), upholding a tuition tax credit law for contributions up to $500 to private schools, including religious schools. The applicable provisions of the Arizona Constitution prohibited the use of public money or property for religious instruction and the use of a tax in aid of a sectarian school. A majority of the Arizona Supreme Court held that the tuition tax credit system involved neither public money nor a tax and, therefore, did not offend the constitutional provisions. See *id.* at 620-21. Unlike *Kotterman*, this case involves a direct subsidy and not a tax credit.

payment of public money to a religious school, for whatever reason, necessarily offends Article 3 because it supports a place of worship. In any event, we believe that such a broad reading of Article 3 was necessarily rejected in *Swart* and *Mann.* We noted in *Swart,* 122 Vt. at 184-85, 167 A.2d at 518, and reiterated in *Mann,* 127 Vt. at 270-71, 247 A.2d at 74, that the "mere fact that public funds are expended to an institution operated by a religious enterprise does not establish the fact that the proceeds are used to support the religion professed by the recipient." At least in *Mann,* this statement was applicable to Article 3. Thus, although the words might appear to be broader, we believe that Article 3 is not offended by mere compelled support for a place of worship unless the compelled support is for the "worship" itself.

As narrowed, plaintiffs' claim is that religious education is not religious worship within the meaning of Article 3. To reinforce this point, they note that the Vermont Constitution contains no specific provision on support of sectarian education, a subject we address in a later section of this opinion.[11] Plaintiffs also draw our attention to Chapter II, § 68, the section on public education, which provides:

> All religious societies, or bodies of people that may be united or incorporated for the advancement of religion and learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities, and estates, which they in justice ought to enjoy, under such regulations as the general assembly of this state shall direct.

Vt. Const. ch. II, § 68. Plaintiffs see in this language an intent to aid religious education, which can occur through financial support. Defendants necessarily take the opposite side of the issue. We do not try to resolve this disagreement on the language alone and consider it in later sections of the opinion.

The second disagreement over the meaning of the text is central to the relationship between Article 3 and the First Amendment. The First Amendment prohibits any law "respecting an establishment of religion." U.S. Const. amend. I. Plaintiffs argue that Article 3

---

[11] On this point, plaintiffs and the concurrence find diametrically opposed plain meaning in the constitutional language. We agree with *Mann* that Article 3 contains "no explicit injunction precluding assistance to sectarian education," 127 Vt. at 269, 247 A.2d at 73, but cannot conclude, as plaintiffs argue, that the absence of an explicit mention of sectarian education in those terms means that Article 3 has no applicability.

expresses the same policy aimed at the same governmental wrong. Thus, they assert that as long as government does not take sides among religions, it may compel support for religious activities. Here, government is not endorsing any religion because the parents have free choice of religious or secular institutions.

Again, defendants disagree with this interpretation, and we do not attempt to resolve it on the language alone. We emphasize, however, that the text appears to be inconsistent with plaintiffs' position. Rather than prohibiting compelled support of a particular or state-selected place of worship, it prohibits compelled support of *"any* place of worship."[12] Vt. Const. ch. I, art. 3.

Although it is tempting to attempt to resolve the meaning of the constitutional provision on the words alone, we believe that approach is not possible in this case. We are particularly guided by our decision in *Peck v. Douglas*, 148 Vt. 128, 132, 530 A.2d 551, 554 (1987):

> The remark of Chief Justice John Marshall in *McCulloch v. Maryland*, 4 Wheat. 316, 407 (1819), that "[w]e must never forget that it is a constitution we are expounding" resounds as a vital truth, and we keep it in mind as we face the task before the Court in this case. The standards for interpreting constitutional language and meaning, though related, are not the same as for ordinary statutes. Canons of construction, if applied, must be used more cautiously and sometimes differently.

When embarking on the process of statutory construction, we have established a clearly articulated hierarchy of available sources and turn first to the "plain, ordinary meaning of the language." *Brennan v. Town of Colchester*, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999) (citation omitted). If we can derive the intent of the Legislature from the plain meaning of the words, our task is normally at an end. See

---

[12] We note, and must respectfully disagree with, the Ohio Supreme Court's recently expressed dictum that the Compelled Support Clause of the Ohio Constitution, which also precludes "compelled . . . support" of "any place of worship," is the "approximate equivalent" of the Establishment Clause. *Simmons-Harris*, 711 N.E.2d at 211 (quoting Ohio Const. art. I, § 7). The Ohio court struck down that state's school voucher program on unrelated state constitutional grounds, *id.* at 214, while explicitly recognizing that the religion clauses of the Ohio Constitution are "quite different from the federal language." *Id.* at 212. Thus, although the Ohio Supreme Court refused to distinguish a Compelled Support Clause from the Establishment Clause, the court was careful to "reserve the right to adopt a different constitutional standard" under the state constitution in a future case. *Id.* We are required to confront the problem squarely in the instant proceeding.

*Harris v. Sherman,* 167 Vt. 613, 614, 708 A.2d 1348, 1349 (1998) (mem.). By contrast, our decisions interpreting the Vermont Constitution have carefully avoided such a hierarchy. See *Benning v. State,* 161 Vt. 472, 476, 641 A.2d 757, 759 (1994) (noting that words of constitutional text are one of the tools available to find meaning of a constitutional provision). Other courts of last resort have followed this approach. See, e.g., *Thompson v. Craney,* 546 N.W.2d 123, 127 (Wis. 1996) ("plain meaning" of words is one of three sources used in construing the Wisconsin Constitution); *Charles Reinhart Co. v. Winiemko,* 513 N.W.2d 773, 785 (Mich. 1994).

There are sound reasons for avoiding excessive reliance on a plain meaning approach to constitutional interpretation, even if a plain meaning can be found. The compelled support language of Article 3 was first adopted in 1777 and has antecedents going back to the Seventeenth Century. See *infra* at 328-36, 738 A.2d at 552-57. In trying to discern what such language means, we are "trying to make the best sense we can of an historical event — someone, or a social group with particular responsibilities, speaking or writing in a particular way on a particular occasion." R. Dworkin, *The Arduous Virtue of Fidelity: Originalism, Scalia, Tribe, and Nerve,* 65 Fordham L. Rev. 1249, 1252 (1997). As Professor Dworkin suggests, using as an example Milton's reference to "gay hordes" in *Paradise Lost,* the older the text, the more significant historical context becomes. See *id.* at 1251-53.

We pointed out in *Benning* that the constitutions of the New England states are "basically philosophic documents designed first and foremost to set a direction for civil society and to express and institutionalize a theory of republican government." *Benning,* 161 Vt. at 476, 641 A.2d at 759. Similarly, we stressed in *Peck* that statutory construction techniques are often inapplicable because "a constitutional provision, unlike a statute, usually operates to limit or direct legislative action" and the constitution delineates only a "framework of government . . . [with] working details . . . left . . . for legislative definition." *Peck,* 148 Vt. at 132, 530 A.2d at 554. Finally, we note that the primacy of plain meaning in statutory construction is based upon the fact that the Legislature can change the wording to reflect its true intent with relative ease, a correction that is much more difficult for a constitutional provision. See J. Rubenfeld, *Reading the Constitution as Spoken,* 104 Yale L.J. 1119, 1130 (1995).

Even if we were prepared to say that the phrase "support any place of worship" has a plain meaning for the case before us, if it were

included in a modern statute, we cannot say that it has such a meaning as placed in Article 3. We must proceed to other evidence of the meaning of the Article.

## C. Historical Context

One of our most useful tools to determine the meaning of a constitutional provision is an understanding of its historical context, and we have often relied upon history to illuminate the meaning of our constitution. See *Brigham v. State*, 166 Vt. 246, 257, 692 A.2d 384, 391 (1997); *State v. Wood*, 148 Vt. 479, 482, 536 A.2d 902, 904 (1987) (Chapter I, Article 11 must be construed consistent with its "historic purpose"). As the *Swart* Court found in examining the historical record, it does not uniformly point in one direction. Like many of the colonies, our early history shows that we were organized by religious people for whom religion was central to their social and political life. We accepted the Church of England as an established state religion. The original prohibitions on religious discrimination in the 1777 Constitution applied only to men who professed "the protestant religion." Vermont Constitution of 1777, reprinted in *Records of the Council of Censors of the State of Vermont* 6 (P. Gillies & D. Sanford eds. 1991). The oath of office required that members of the House of Representatives be Protestants. See *id.* at 10. At the time of the adoption of the current constitution, the Legislature gave towns the power to tax to support churches. See *Swart*, 122 Vt. at 182-83, 167 A.2d at 517.

There are, however, three elements of the history that support defendants' position that the constitution prohibits the state financing of religious education involved in this case. The first is our own experience with public support of churches and ministers. By a 1783 "Act to Enable Towns and Parishes to Erect Proper Houses for Public Worship and Support Ministers of the Gospel" (the Ministerial Act), two-thirds of the voters of a town could levy a tax on property in the town to construct a meeting house and hire and support a minister. 13 *Laws of Vermont* 195 (J. Williams ed.). Citizens could avoid taxation only by presenting a certificate signed by a minister, deacon or elder of their church to the effect that they had "different Sentiments in religious Duties" than those of the supported minister and church. *Id.* at 196. That act was adopted even though the 1777 Constitution contained the nonsupport language of Article 3 and remained in effect through the adoption of the 1786 and 1793 Constitutions.

Our state constitution antedates the concept, first enunciated by the United States Supreme Court in *Marbury v. Madison*, 5 U.S. (1

Cranch) 137, 177-78 (1803), that in the form of government established by the federal constitution, the judiciary would be the ultimate arbiter of constitutional meaning.[13] Thus, it is not illogical that the framers of the Vermont Constitution provided for what was at least an alternate avenue for reconciling statutory enactments with the fundamental blueprint of state government. This they did. Until 1870, the Vermont Constitution provided for a Council of Censors, an elected body of thirteen that came together every seven years to determine whether "the legislative and executive branches of government . . . have . . . assumed to themselves, or exercised, other or greater powers than they are entitled to by the constitution." Constitution of 1777, § XLIV. Although the Council of Censors was "an advisory body whose authority came from its position and its persuasiveness," *Records of the Council of Censors*, Introduction, at xi, its actions commanded serious respect and often resulted in changes in laws, especially in its early years.

In 1799, the Council of Censors reported that the 1797 version of the Ministerial Act to support the gospel violated Article 3 and should be repealed. After quoting the nonsupport language, the Council reasoned:

> Here . . . conscience is made the only criterion by which a man can possibly be bound, in the execution of such designs; in opposition to which, the law we hereby propose to have repealed, expressly binds the citizens of this state, indiscriminately, to erect and support places of public worship, and to maintain ministers, contrary to this clearly defined right, provided they are so unfortunate as to be in the minority of any town, who may act under the authority of this law, and who are not at the time of taking the vote, possessed of a certain prescribed certificate.
>
> Could not the legislature as well declare, that the inhabitants of every town in this state, should build a house for public worship, and settle and support a congregational minister, provided a certain number thereof were not possessed of a certificate, that they supported a minister of a different denomination? This would only support the same ground that the law contemplates, as in both cases the

---

[13] This Court had, however, accepted such a premise before *Marbury*, see, e.g., *Doe v. Smith*, 1 Tyler 38, 41 (1801), although it first struck down a legislative act as unconstitutional in *Dupy v. Wickwire*, 1 Chipman 237, 238 (1814).

minority are only subjected by the majority. But in no case have civil power any constitutional right to interfere in religious concerns, except to bind persons or communities to discharge their civil contracts, individually entered into, for the mutual support of religious social worship.

*Id.* at 158 (quoting An Address of the Council of Censors to the People of Vermont (1800)); see also II S. Williams, Natural and Civil History of Vermont 383 (2d ed. 1809).

The 1800 report proved to be only the first step toward resolving the controversy. In 1801, the Legislature amended the act for the support of the gospel to eliminate what it believed to be the offending provisions. See An Act in Addition to, and Alteration of an Act, entitled "An Act for the Support of the Gospel," Laws of 1801, at 17. The 1801 statute maintained the right of two-thirds of the voters to create a system of tax financing of churches and ministers, but liberalized the tax exemption. Under the 1801 statute, the exemption was automatic when the taxpayer delivered to the clerk of the town or parish a signed writing stating: "I do not agree in religious opinion with a majority of the inhabitants of this town (or parish as the case may be)." *Id.* § 2.

Although the 1801 statute eliminated the requirement of a certificate from an alternative religious body, and thus allowed an exemption for those who subscribed to no religion, it did not satisfy the Council of Censors. In its next report in 1806, the Council concluded that the 1801 Act also violated Article 3 and should be repealed. See *Records of the Council of Censors* at 180. The report reiterated that support for religion was a matter of personal conscience for which "[m]an . . . feels himself accountable to none but his God." *Id.* at 181 (quoting Address of the Council of Censors). The Council acknowledged that it was influenced by the "consequences" of the law, which, it believed, fed a "constant belief" that the government had curtailed the privileges of some citizens and lessened their rights, exciting animosities and engendering ill will. *Id.* at 181-82. The Council found the Act represented "the dangerous lengths of which it is a foundation for us to go, in both civil and religious usurpation." *Id.* at 182. On receiving the Council's report, the Legislature repealed the Ministerial Act and ended tax support for ministers in Vermont. See Laws of 1807, ch. xx.

On its face, the Council record is valuable as an early interpretation of Article 3. It is also significant as an answer to the view, apparently espoused by this Court in *Swart*, that the existence of the Act for the

support of the gospel showed that tax support for houses of public worship, and ministers of the gospel was, under proper circumstances, thought to be consistent with Article 3. See *Swart*, 122 Vt. at 183, 167 A.2d at 517. Instead, the historical record shows that the institution charged with determining constitutional conformity, the Council of Censors, from its beginning saw the Act as a violation of Article 3 and pursued this determination until the conflict was eliminated.[14]

Most important, the experience with the Ministerial Act is inconsistent with plaintiffs' position that Article 3 is intended only to prohibit a state establishment of religion. Even the first Ministerial Act was based on the choice of the taxpayer and did not take sides among religions. The telling event, however, was the Council of Censors' rejection of the amended Ministerial Act which allowed an exemption for taxpayers who were unwilling to support any religion. The issue then was not a state establishment of religion, but any public financial support of religious activity, even when raised solely from religious adherents.

The second relevant element of the historical record is the history of the "Virginia Bill for Religious Liberty," as enacted in 1785 based on the draft of Thomas Jefferson. See *Swart*, 122 Vt. at 183-84, 167 A.2d at 518.[15] Because of its author and the primary advocacy for it by James Madison, the Virginia law became an important building

---

[14] The history of the Ministerial Act is instructive on how the early constitutional provisions were viewed in their time. In modern times, we have stressed the "preeminence of the Vermont Constitution in our governmental scheme" and that it "stands above legislative or judge-made law." *Shields v. Gerhart*, 163 Vt. at 223, 658 A.2d at 927. That view did not prevail uniformly in the eighteenth century, at least among those who led the state at the time. See G. Aichele, *Making the Vermont Constitution: 1777-1824*, 56 Vermont History 166, 186 (1988). The Council of Censors became a vehicle for the lawyers, who assumed leadership positions at the end of the eighteenth century and beginning of the nineteenth, to insist on the supremacy of the constitution over the more pragmatic approach to governance that had frequently prevailed. See F. Smallwood, *Thomas Chittenden: Vermont's First Statesman* 125-28, 133-34 (1997). Thus, we view the Ministerial Act history as less a debate and conflict among persons who had differing views about the meaning of the constitutional language and more a conflict about whether Vermont's government would adhere to the constitutional command.

[15] *Swart* discussed the Virginia Act as relevant to its analysis of the United States and Vermont Constitutions and drew no specific conclusion about it. Its influence on the First Amendment was direct because James Madison was a drafter of the First Amendment. We have no direct evidence of its influence on the adoption of the provision of the Vermont Constitution, although it could well have had an influence. Our interest here is in the contemporaneous understanding of the wording chosen to express Jefferson's views.

block for the First Amendment to the United States Constitution and the interpretation of that amendment by the United States Supreme Court. See *Everson*, 330 U.S. at 11-16. We also find this law, and its history, relevant to our interpretation of Article 3.

Although the Virginia law has a detailed preamble that is important to its interpretation, the enactment is quite short, and its nonsupport provision is very similar to Article 3. It provides:

> *We the General Assembly of Virginia* do enact that no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or bur[d]ened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinion in matters of religion, and that the same shall in no wise diminish, enlarge, or effect their civil capacities.

T. Buckley, Church and State in Revolutionary Virginia, 1776-1787, at 191 (1977) (reproducing text); *Everson*, 330 U.S. at 13 (reproducing part of same text). The language of the Virginia law relevant to the controversy before us states that a man shall not be "compelled to . . . support any religious worship, place or ministry whatsoever." The preamble describes the policy of the language: "that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves *and abhors*, is sinful and tyrannical." Buckley, *supra*, at 191; *Everson*, 330 U.S. at 13 (reproducing same text in slightly different form).

The Virginia law was passed in response to a bill "Establishing a Provision for Teachers of the Christian Religion," which almost passed in the years before the Jefferson law was enacted. See *Everson*, 330 U.S. at 72-74 (Rutledge, J., dissenting, Supplemental Appendix).[16] It provided for taxpayer support of "learned teachers" of "Christian knowledge" in order "to correct the morals of men, restrain their vices, and preserve the peace of society." *Id.* at 72. Each owner of property on which the tax was levied would specify the "society of Christians" to which the owner's tax money would be paid. *Id.* at 72-73. If the taxpayer failed to specify the beneficiary, that

---

[16] We have provided citations to the relevant documents in the text and appendices of *Everson* as the source most likely to be available to the readers of this opinion. The sequence of events, as well as the relevant documents, are described in detail in Buckley, *supra.*

money would be placed in the public treasury to be expended for the encouragement of seminaries of learning in the county. *Id.* at 74.

In his "Memorial and Remonstrance" on the bill, James Madison described its provisions as "a dangerous abuse of power." *Id.* at 64. Madison's main disagreement with the bill was because man's duty is "to render to the Creator such homage, and such only, as he believes to be acceptable to him." *Id.* He argued that it discriminated against those who professed a non-Christian religion or no religion:

> Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us. If this freedom be abused, it is an offence against God, not against man: To God, therefore, not to men, must an account of it be rendered.

*Id.* at 66.

Jefferson was later to describe the Virginia law as creating "a wall of separation between church and State." *Reynolds v. United States,* 98 U.S. 145, 164 (1878). What is instructive here is that the language used to create the wall is essentially the same as that in Article 3 of our constitution. See G. Tarr, *Church and State in the States,* 64 Wash. L. Rev. 73, 81 (1989) (familiar story of struggle of Jefferson and Madison to establish religious freedom in Virginia "can offer new insights if viewed from the perspective of state constitutionalism"). Moreover, the Virginia law was enacted in response to a plan that bears some similarities to that before us. It applied specifically to religious teachers, and although it required tax financing of education, it gave choice in the method of its implementation. Christians could choose their beneficiary, and any taxpayer could choose to designate the money to the seminary education system of the time, rather than to a religious order. Despite the choice feature, the Virginia law responded that compelling "a man to furnish contributions of money for the propagation of opinion which he disbelieves and abhors, is sinful and tyrannical."

We believe that the Virginia experience undercuts plaintiffs' position that the intent of Article 3 was to cover religious worship, but not religious education. The Virginia controversy was about religious education, and Madison saw no line between it and religious worship. Language virtually identical to Article 3 was adopted to prohibit compelled support of religious education.

The third relevant element of the historical record is the source of the constitutional language. Much of our original constitutional language came from that of Pennsylvania. See J. Shaeffer, *A Comparison of the First Constitutions of Vermont and Pennsylvania* in *In a State of Nature: Readings in Vermont History* 54, 54 (H. Muller & S. Hand eds. 1982). Thus, Article I, § 3 of the Pennsylvania Constitution of 1776 provided that "no man ought or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent." See W. Ball, *The Religion Clauses of the Pennsylvania Constitution*, 3 Widener J. Pub. L. 709, 714 n.25 (1994). Pennsylvania evolved under the dominating influence of the Quakers and did not establish an official church. See T. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* 72 (1986); L. Levy, *The Establishment Clause: Religion and the First Amendment* 25 (1986). Indeed, "from its beginnings, . . . [Pennsylvania] established the broadest religious liberty in colonial America . . . , and [t]he colony incorporated into its laws . . . a refusal to provide public tax support for churches and clergy." Curry, *supra*, at 75. The constitutional nonsupport language goes back to the 1682 Frame of Government of the commonwealth. See *id.*

*Swart* cited the differences between the Pennsylvania Constitution and the Vermont Constitution, quoting from the mid-nineteenth century biography of Thomas Chittenden by Daniel Chipman for the proposition that Vermont adopted a diluted version of the Pennsylvania religion clause because the Pennsylvania view of "'religious liberty would be somewhat larger than the people of New England had been accustomed [to].'" *Swart*, 122 Vt. at 182, 167 A.2d at 517 (quoting D. Chipman, *Memoir of Thomas Chittenden* 84 (1849)). We have noted, however, that the Chipman observation was about the final sentence in Article 3 and not the nonsupport clause. See *DeLaBruere*, 154 Vt. at 265, 577 A.2d at 269. Indeed, Chipman found no significant difference between the nonsupport clause in the Vermont Constitution and that in the Pennsylvania Constitution. See Chipman, *supra*, at 28-29.[17] We believe that the 1777 and later

---

[17] Later historians have noted that Chipman undercounted the number of changes and left out some significant changes. See *Schaeffer, supra*, at 50. (asserting there are twenty-seven substantive changes). Although the wording of the Vermont religion provision is slightly different from that of the Pennsylvania provision, none of the historians have found that difference significant.

constitutions necessarily imported Pennsylvania's Quaker view of nonsupport into our constitutional law.

We recognize that one part of the Pennsylvania history raises questions about the applicability of Article 3 to religious education, supporting plaintiffs' position. As one commentator noted: "Article I, section 3 [of the Pennsylvania Constitution] was adopted in 1776, long before Pennsylvania's public school system was in place. The framers of the article, therefore, could not have pondered its application to sectarian school grants once a public school system evolved." J. Jones, *Pennsylvania's Choice: "School Choice" and the Pennsylvania Constitution*, 66 Temple L. Rev. 1289, 1311 (1993).[18] On this point, we believe our history is different.

Following most of the language of the Pennsylvania Constitution, the 1777 Vermont Constitution provided that "[a] school or schools shall be established in each town, by the legislature, for the convenient instruction of youth, with such salaries to the masters, paid by each town, making proper use of school lands in each town, thereby to enable them to instruct youth at low prices." Constitution of 1777, Chapter II, Section XL. By 1782, the Vermont Legislature had implemented the section by "providing for and requiring that a uniform system of local school districts be created and that they be financed by taxes on all rateable property of residents of the district, supplemented by a special tax paid by parents whose children attended schools." Fussell, *The Emergence of Public Education as a Function of the State in Vermont*, 29 Vermont History 13, 37 (1961); see also M. Stone, *History of Education: State of Vermont* 51-55 (1935). The system was "sufficiently comprehensive in scope and purpose." Stone, *supra*, at 53.[19]

Public education in Vermont may have been only an ideal when our first constitution was adopted, but it quickly became a reality when state and local government could deal with matters other than the security of the inhabitants. We see no reason why, from its first adoption, Article 3 would not be seen to cover all forms of religious worship even as part of religious education. As indicated above, the

---

[18] Despite the historical point, the author concludes that tuition payment to sectarian schools under a choice plan should be found to violate Article I, § 3 of the Pennsylvania Constitution, arguing that the need to subsidize nonpublic schools "has long since passed and there is no longer a need to ignore the limits of article I, section 3." See Jones, *supra*, at 1311-12.

[19] In comparison, Pennsylvania passed an act to establish a general system of education in public schools in 1834, almost fifty years after it adopted its constitutional language. See A. Stokes & L. Pfeffer, *Church and State in the United States* 271 (1st ed. 1964).

Virginia religious-support controversy arose over what was being labeled as religious education. We believe that no artificial line between religious worship and religious education emerged in Vermont.

One other aspect of our history deserves some consideration, primarily for what it does *not* tell us, and is a bridge to our consideration of decisions from other states. Broadly speaking, all of the state constitutions in the United States contain some combination of the following provisions: (1) an Establishment Clause that is substantially similar to the language of the First Amendment; (2) a Compelled Support Clause identical or similar to that in the Vermont Constitution; (3) a prohibition against the state exercising any preference toward any religious group or discriminating among them; (4) a direct prohibition on the state making contributions of public funds to religious institutions and/or sectarian schools; and (5) a clause proscribing state support for any private school regardless of whether it is sectarian or not. See Note, *Beyond the Establishment Clause: Enforcing Separation of Church and State Through State Constitutional Provisions*, 71 Va. L. Rev. 625, 631-43 & nn.31-47 (1985) (citing and cataloging constitutional provisions at issue). The constitution of every state except Maryland and Vermont contains some form of the latter two clauses. See *Horace Mann League v. Board of Pub. Works*, 220 A.2d 51, 76 (Md. 1966).

The significance of Vermont's decision not to adopt a more explicit constitutional provision addressing sectarian schools is in dispute. Plaintiffs contend that this historical omission shows that the constitutional drafters were not concerned with public funding of religious schools. At least in part, the Maryland courts have accepted this argument. After noting that the Maryland legislature imposed taxes to support churches well after the constitutional nonsupport language was adopted, the Maryland Court of Appeals commented, "Had the people of Maryland desired to change its practice relative to such grants, it certainly would be likely that they would have made similar provisions after so many states had done so." *Id.* Thus, the court found that the absence of a special constitutional provision demonstrated that Maryland citizens were not concerned about subsidies for religious schools.

We cannot place the significance on the absence of a more specific constitutional provision urged by plaintiffs and accepted by the Maryland court. As discussed above, our experience with public support of religious institutions is different from that in Maryland.

We did not have the same reason to adopt such a provision as existed in Maryland. Moreover, the specific prohibitions on public financial support for religious schools and other religious institutions were not in the original constitutions of the early American states. They were adopted between 1830 and 1928 in response to attempts to obtain funds for Roman Catholic institutions, particularly schools. See Note, *Catholic Schools and Public Money*, 50 Yale L.J. 917, 919-20 (1941) (citizens saw that "the intersectarian compromise [of secular public schools] was safe only if embodied in explicit constitutional provision"); R. Utter & E. Larson, *Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution*, 15 Hastings Const. L.Q. 451, 464-67 (1988); Stokes & Pfeffer, *supra*, at 271 (from 1844 on, every state amending its constitution, and most new states on admission to the union, adopted a constitutional provision prohibiting "any diversion of public funds to denominational purposes"). These later amendments shed no light on Article 3, which was first adopted in 1777.

More importantly, the Vermont Constitution is the least susceptible to being defined by its omissions. It is the shortest and least amended constitution in the United States. See J. Kinkaid, *State Constitutions in the Federal System*, 496 Annals of the American Academy of Political and Social Science 12, 18 (1988) (noting that Vermont's is the only state constitution shorter than the U.S. Constitution). Chapter I, the Declaration of the Rights of the Inhabitants of the State of Vermont, has been amended only twice since 1793; neither amendment was to Article 3. See W. Hill, *The Vermont State Constitution: A Reference Guide* 20, 23 (1992). The school provision, Chapter II, § 68, has been amended twice, but the amendments occurred in 1954 and 1964, after the United States Supreme Court applied the religion provisions of the First Amendment to the states, see *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), and the decisions in *Everson* and *McCollum* made clear that direct payment of state funds for religious education offended the First Amendment. In view of this history, we can draw no significance from the absence of a special constitutional amendment on religious education.

## D. Decisions of Other States

In that light, we next consider the decisions from other states on similar issues. We have often found that analysis of the decisions of sibling states is helpful in interpreting provisions of the Vermont Constitution. See *Ely*, 167 Vt. at 331, 708 A.2d at 1337; *Benning*, 161

Vt. at 478, 641 A.2d at 760; *DeLaBruere*, 154 Vt. at 266, 577 A.2d at 270. Of course, these decisions must be based on similar or identical constitutional language. See *Brigham*, 166 Vt. at 257, 692 A.2d at 391; *Read*, 165 Vt. at 154, 680 A.2d at 952.

Because virtually all states have amended their constitutions to adopt specific provisions on state support of religious institutions, particularly sectarian schools, many of the decisions involving fact patterns similar to that before us are only marginally relevant to our task. The primary example of this is the recent Wisconsin Supreme Court decision in *Jackson*, which upheld against state and federal constitutional attack the Wisconsin "Parental Choice Program," a plan that provides for public school students to attend both sectarian and nonsectarian private schools at taxpayer expense. Specifically, the court held that the program did not violate the Compelled Support Clause of Article 1, § 18 of the Wisconsin Constitution, a provision similar to Article 3. See *Jackson*, 578 N.W.2d at 623.

We would view *Jackson* as a strong precedent for plaintiffs' position, but its reasoning is unpersuasive. Article 1, § 18 of the Wisconsin Constitution also contains language that prohibits drawing funds from the state treasury "'for the benefit of religious societies, or religious or theological seminaries.'" *Id.* at 620 (quoting Wis. Const. Art. I, § 18). Noting that it has "traditionally looked to federal establishment clause jurisprudence, and in particular the primary effects test," when interpreting this clause from the Wisconsin Constitution, the court reasoned that the primary effect of the School Choice Program was not the advancement of religion given the program's neutrality as between "sectarian and nonsectarian alternatives." *Id.* at 621 & n.21. Thus, the court upheld the program under the Benefit Clause.

The Wisconsin Supreme Court went on to rule that the School Choice Program also did not transgress the Compelled Support Clause of Article I, § 18, reasoning:

> The Respondents assert that since public funds eventually flow to religious institutions under the [School Choice Program], taxpayers are compelled to support places of worship against their consent. This argument is identical to the Respondents' argument under the benefits clause. We will not interpret the compelled support clause as prohibiting the same acts as those prohibited by the benefits clause. Rather we look for an interpretation of these two related provisions that avoids such redundancy.

*Id.* at 622-23 (citation omitted). The court decided that because of the presence of the Benefit Clause, the Compelled Support Clause must relate only to those who use the tax money. Since students were not required either to attend sectarian schools or to participate in religious activities when they did,[20] the court held that the program did not violate the Compelled Support Clause. *Id.* at 623.

Our constitution lacks a specific provision akin to Wisconsin's Benefit Clause. Thus, we are not required to adopt a construction of our Compelled Support Clause that is consistent with, and subservient to, this more specific provision. Not surprisingly, we can find no other state decision that construes a Compelled Support Clause in the way that the Wisconsin Supreme Court construed its constitutional provision. Indeed, plaintiffs have never argued that Article 3 can be construed in the fashion adopted by the Wisconsin Supreme Court.

*Jackson* demonstrates that we can rely only on decisions that are based on a Compelled Support Clause, and where the court's construction of the clause is not determined by its construction of other more specific provisions. Our review of the decisions from other states shows a few such cases.

As already noted, the Ohio Supreme Court has very recently decided a case that includes dicta essentially equating the Ohio Constitution's Compelled Support Clause with the Establishment Clause of the First Amendment. See *Simmons-Harris*, 711 N.E.2d at 210. For the reasons already discussed, both the wording of Vermont's Compelled Support Clause and the relevant historical record preclude us from adopting such a view. Accordingly, we draw no useful insights from the Ohio decision.

Another case is *Almond*, which takes up a "free exercise" clause, an explicit prohibition against the appropriation of public funds or property to sectarian institutions or entities controlled by such an institution, and a Compelled Support Clause that is similarly worded to Vermont's. See *Almond*, 89 S.E.2d at 857-58. At issue was a program providing for state tuition payments to orphans of Virginia citizens who had served in the military. See *id.* at 853. The funds were made available for children attending both sectarian and nonsectarian schools. See *id.* at 854. In determining that the program was inconsistent with the Virginia Constitution, the court found three

---

[20] We do not believe that we can make the same finding about the tuition-payment plan in Vermont. Nothing prevents the school for which tuition is paid from requiring that students participate in religious exercises, and MSJ appears to have such a requirement in some instances.

independent bases for its decision: the use of public funds to provide direct support of religious institutions in contravention of antiestablishment principles, the provision of an "invaluable aid" to sectarian groups "through use of the state's compulsory public school machinery," and the fact that the tuition-payment program "compels taxpayers to contribute money for the propagation of religious opinions which they may not believe." *Id.* at 858.[21]

We have also considered *Knowlton v. Baumhover*, 166 N.W. 202 (Iowa 1918), decided under a constitutional provision that reads:

> The General Assembly shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; nor shall any person be compelled to attend any place of worship, pay tithes, taxes or other rates for building or repairing places of worship, or the maintenance of any minister, or ministry.

Iowa Const., Art. I, § 3. In *Knowlton*, the school district had closed the public schoolhouse and rented space for public education in a Roman Catholic parochial school. Although the public school classroom was separate, the class was taught by a Catholic nun, "arrayed in the striking robes" of her order, and instruction included the study of the Catholic catechism and other Catholic religious study. Holding that § 3 forbids "all taxation for ecclesiastical support" and that it was not necessary "to show that the school is wholly devoted to religious or sectarian teaching," the court found that the school arrangement violated § 3 because it used "the public schools or the public funds for the advancement of religion or sectarian teaching." *Knowlton*, 166 N.W. at 207. The court did not frame its discussion around the issue of establishment, i.e., concerns over whether the program at issue was enfranchising Catholicism as an official state religion to the exclusion of all others, but rather that such a program requires individual taxpayers to support a religious denomination regardless of whether they would so choose. See also *Rudd v. Ray*,

---

[21] In a more recent case concerning a city bond issue designed in part to provide construction assistance to sectarian educational institutions, the Virginia Supreme Court has omitted the nonsupport clause from an enumeration of the "pertinent" language in article I, chapter 16 of the Virginia Constitution. *Habel v. Industrial Dev. Auth. of Lynchburg*, 400 S.E.2d 516, 518 (Va. 1991). The court invalidated the bond issue based on the language prohibiting the state from conferring any "peculiar privileges or advantages on any sect or denomination." *Id.* at 518-19. It is not clear whether the court deliberately eschewed mention of the Compelled Support Clause or whether the parties simply did not invoke it.

248 N.W.2d 125, 132 (Iowa 1976) (noting that framers of Iowa Constitution sought to enjoin both "the evils incident to a state church, [and] forced taxation to support the same").[22] Although the facts of *Knowlton* are somewhat different from those before us, we do not believe its constitutional analysis can be meaningfully distinguished by the situation we confront in the instant case. See also *Williams v. Board of Trustees Stanton Common Sch. Dist.*, 191 S.W. 507, 507 (Ky. 1917) (Compelled Support Clause of Kentucky constitution among provisions requiring that "no part of the common school fund shall ever be used in aid of or for the use or benefit of a sectarian or denominational school"); *Berghorn v. Reorganized Sch. Dist. No. 8*, 260 S.W.2d 573 (Mo. 1953);[23] *Findley v. City of Conneaut*, 62 N.E.2d 318, 323 (Ohio 1945) (under Ohio Constitution's Compelled Support and Nonpreference Clauses, municipality without authority to comply with condition in benefactor's will to issue bonds to support sectarian school established by will); cf. *People v. Board of Educ.*, 68 N.E.2d 305, 308 (Ill. 1946) (Compelled Support Clause in Illinois Constitution not a bar to public school program of released time for religious instruction).

It is important to put these decisions from other states in context. We are not dealing here with the myriad ways that a public school

---

[22] In *Rudd*, the court sustained the practice of furnishing chaplains and facilities for their work at the state penitentiary. See *Rudd*, 248 N.W.2d at 133. The basis of the holding was historical analysis unique to Iowa: In 1855, two years before a constitutional convention adopted the identical Establishment and Compelled Support Clauses contained in the 1846 version of the state constitution, Iowa's legislature adopted legislation authorizing the challenged prison practice. See *id.* at 132. The court thus reasoned that it "seems likely the delegates to the 1857 Iowa Constitutional convention did not feel Art. I, § 3, of [Iowa's] present constitution would proscribe a statutory scheme then recently enacted." See *id.* Without discussion, the court dismissed *Knowlton* and other previous Iowa cases as not controlling. See *id.*

[23] In *Berghorn*, the Supreme Court of Missouri invalidated on state constitutional grounds a taxpayer-supported program of school instruction conducted on church property by Catholic nuns. *Berghorn*, 260 S.W.2d at 583. Although the opinion does not refer explicitly to the teaching of sectarian principles, it notes that children who objected to "certain practices" (presumably religious ones) in the schools in question were given the option of attending conventional public schools elsewhere. See *id.* at 583-84. The opinion does not refer to which specific language in the Missouri Constitution provides the basis for its holding, but it quoted with approval the trial court's conclusion that the state constitution establishes an "unqualified policy . . . that no public funds or properties, either directly or indirectly, be used to support or sustain any school . . . conducted in such a manner as to influence or predispose a school child towards the acceptance of any particular religion or religious beliefs." *Id.* at 582-83. Missouri's constitution includes both a Compelled Support and a Nonpreference Clause as well as language enjoining appropriations in support of sectarian institutions. See Mo. Const. art. I, §§ 6-7.

342

district can subsidize education in a religious school by paying for expenses that occur whether or not the school was sectarian.[24] For example, this case is not governed by those that involve payments for school transportation to sectarian schools, see, e.g., *Snyder v. Town of Newtown*, 161 A.2d 770, 778-79 (Conn. 1960) (provision of transportation assistance to children of sectarian schools "primarily serves the public health, safety and welfare and fosters education" and "cannot be said to compel support of any church"), text books used in sectarian schools, see, e.g., *Opinion of the Justices*, 258 A.2d 343, 347 (N.H. 1969) (textbook loan program constitutional if books are secular), or teachers of secular subjects to sectarian school children, see *Scales v. Board of Educ.*, 245 N.Y.S.2d 449, 454 (Sup. Ct. 1963) (home-teaching assistance of handicapped parochial school student constitutional because aid to parochial school is "slight and remote"). Nor is this a case where the amount of the subsidy is so small that it clearly covers only the cost of secular educational expenses. See *Dunn v. Chicago Indus. Sch. for Girls*, 117 N.E. 735, 737 (Ill. 1917) (payment to Roman Catholic industrial school on behalf of committed juvenile is constitutional since payment amount is below cost of food, clothing, medical care and training in useful arts and domestic science and only half of such costs in secular institution). Nor, as we emphasized above, is the issue that education occurs in a religious school, rather than the content of that education. In this case, the financing scheme can, and presumably will, directly pay for religious instruction. An early leading treatise on American state and federal constitutional law summarizes the law applicable to this case as follows: "Those things that are not lawful under any of the American constitutions may be stated thus: . . . (2) Compulsory support, by taxation or otherwise, of religious instruction." 2 T. Cooley, Constitutional Limitations 966-67 (8th ed. 1927).

█ In conclusion, we return to the Article 3 textual issues that divide the parties. In view of the history, as we have outlined above, and the decisions from other jurisdictions, we see no way to separate religious instruction from religious worship. The limited record we have before us indicates that there is no line between these concepts. Nor are we persuaded that the constitutional drafters authorized

---

[24] Although the concurrence has not fleshed out its plain meaning approach, we infer that it would find unconstitutional any subsidy for activities in or by a sectarian school, irrespective of the sectarian nature of those activities. We stress that we are not deciding whether any of the subsidies discussed in the text would violate Article 3.

public financing of religious education in Chapter II, § 68. The specification that such education be "encouraged and protected" does not extend to public financing in light of the prohibition of Article 3.

Nor do we believe that Article 3 is intended to cover only state religious establishments. This limitation is consistent with neither the text nor the history, particularly the action of the Council of Censors with respect to the Ministerial Act.

██ Thus, we conclude that the Chittenden School District tuition-payment system, with no restrictions on funding religious education, violates Chapter I, Article 3. In expressing this conclusion, we think it appropriate to state what we have not decided. The major deficiency in the tuition-payment system is that there are no restrictions that prevent the use of public money to fund religious education. See *Opinion of the Justices*, 616 A.2d 478, 480 (N.H. 1992) (deficiency in educational-choice plan under New Hampshire Constitution is that "[n]o safeguards exist to prevent the application of public funds to sectarian uses"). Schools to which the tuition is paid by the district can use some or most of it to fund the costs of religious education, and presumably will. We express no opinion on how the State of Vermont can or should address this deficiency should it attempt to craft a complying tuition-payment scheme. We decide only that the current statutory system, with no restrictions on the purpose or use of the tuition funds, violates Article 3.

We are also, by this opinion, not taking sides on the desirability of parental choice to determine the education available to their children. As plaintiffs have argued, and as we have accepted at least in part in *Campbell*, the United States Supreme Court may well decide that the intervention of unfettered parental choice between the public funding source and the educational provider will eliminate any First Amendment objection to the flow of public money to sectarian education. We cannot conclude, however, that parental choice has the same effect with respect to Article 3. If choice is involved in the Article 3 equation, it is the choice of those who are being required to support the religious education, not the choice of the beneficiaries of the funding. Even the choice of the taxpayers, however, was not sufficient to save the Ministerial Act in the view of the Council of Censors.

### IV. Plaintiff's Free Exercise Claim

Because we have concluded that Chittenden's tuition payments to religious schools violate Article 3, we must address plaintiff's addi-

tional contention that such an outcome violates the Free Exercise Clause of the First Amendment. It plainly does not. The Free Exercise argument is premised on plaintiff's assumption that we would conclude that children who attend religious schools may not receive public educational funding, while children who attend public schools may. This is not our ruling. We have determined only that public funds may not pay for religious worship within the meaning of Article 3, wherever it occurs.

■ Such a determination is in no sense at variance with bedrock jurisprudence relating to the Free Exercise Clause. The touchstone is "neutrality toward religion." *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet,* 512 U.S. 687, 696 (1994) (citation and internal quotation marks omitted). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires," and a state is therefore precluded from "impos[ing] special disabilities on the basis of religious views or religious status." *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 877 (1990) (citations omitted); see also *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532 (1993). Therefore, a statute may violate the Free Exercise Clause only if its "purpose or effect . . . is to impede the observance of one or all religions" and regardless of whether any such effect is direct or indirect. *Sherbert v. Verner,* 374 U.S. 398, 404 (1963). Obviously, and as noted in *Sherbert,* the Free Exercise Clause may be implicated where the denial of a government benefit is the instrumentality. See *id.* However, unlike the unemployment benefits at issue in *Sherbert,* denied to the plaintiff in that case because her religious beliefs prohibited her from working on Sundays, today's ruling requires no one "to choose between following the precepts of [his or her] religion and forfeiting benefits" that would otherwise be available from the government. *Id.*; see also *Strout,* 178 F.3d at 64-65 (sustaining statutory ban on tuition reimbursement for sectarian schools); *Bagley,* 728 A.2d at 135 (same).

## V. Conclusion

By prohibiting compelled taxpayer support of religious worship, Chapter I, Article 3 of the Vermont Constitution renders unconstitutional the Chittenden Town School District tuition-payment policy to the extent that it authorizes tuition reimbursement to sectarian schools without appropriate restrictions. This application of state

constitutional law does not implicate the Free Exercise Clause of the First Amendment. Because we conclude that the superior court correctly entered summary judgment in favor of defendants, their cross-appeal and plaintiffs' motion to dismiss it are both moot and need not be considered.

*Affirmed.*

**Johnson, J.,** concurring. While I agree with the result reached by the majority, I believe that the majority asks and answers the wrong question, causing it to delve into a lengthy and unnecessary analysis of the distinction (or lack thereof) between religious education and religious worship. It has eschewed a more straightforward analysis based on the plain meaning of Chapter I, Article 3 of the Vermont Constitution and the specific facts of this case, and has unnecessarily confused our holding as a result.

The issue before us is simple. Chittenden School District wishes to use tax revenues to fund tuition payments to Mount Saint Joseph's Academy (MSJ). The plain language of Article 3 prohibits the state from compelling citizens to support a place of worship. Taxation is compelled support. MSJ, the parties agree, is a pervasively sectarian school at which religious worship regularly takes place in conjunction with educational activities. Therefore, the payments to MSJ violate Article 3.

Chittenden School District and plaintiffs-intervenors did not confront the plain language of Article 3 either in their appellate briefs or at oral argument.[1] To the extent plaintiffs made any argument based on the Vermont Constitution, it was that the Compelled Support Clause of Chapter I, Article 3 and the Education Clause of Chapter II, § 68 are coextensive with the federal provisions. As plaintiffs emphasize, and as we detailed in *Campbell v. Manchester Board of School Directors*, 161 Vt. 441, 448-51, 641 A.2d 352, 357-58 (1994), the historic concern under the Establishment Clause of the First Amendment has been with excessive entanglement between religious organizations and governmental actors. The focus in recent cases involving funding of religious schools has been the question of who receives or controls the expenditure of the public money — private individuals

---

[1] Chittenden spent two and one-half pages in its principal brief discussing the Vermont Constitution, and plaintiffs-intervenors cited the Compelled Support Clause in a footnote. At oral argument, Chittenden's only contention under the Vermont Constitution was that the Compelled Support Clause should be read as coextensive with the federal Establishment Clause.

or the sectarian school. See, e.g., *Witters v. Washington Dep't of Servs. for the Blind*, 474 U.S. 481, 488 (1986) (use of grant money to allow student to train as pastor does not violate Establishment Clause where money was provided directly to student); *Mueller v. Allen*, 463 U.S. 388, 400 (1983) (allowing tax deduction for educational expenses permissible under Establishment Clause because financial benefit is ultimately controlled by private choices of individual parents).

Relying on the logic of these federal cases, plaintiffs argue that as long as benefits are distributed by and/or to neutral parties — the parents — there is no excessive entanglement with religion because there is no connection between public money and religious activities. They make virtually the same argument under the Vermont Constitution, but carry it one step further. Because 16 V.S.A. § 822 *requires* school districts to make tuition payments *directly* to the school, plaintiffs contend that there is no meaningful distinction between payment to a sectarian school chosen by parents and payment to parents who then send the money to a sectarian school.

Plaintiffs' argument is not, as the majority states, that there is no violation of the Vermont Constitution in this case because religious education is distinct from religious worship. See 169 Vt. at 325, 738 A.2d at 556. Indeed, plaintiffs make quite clear at numerous points in their brief that they want the Court to consider the constitutionality of tuition payments in the specific context of a pervasively sectarian school — a school at which no attempt is made to separate education from worship. Rather, they claim that the Vermont Constitution is not violated by payments to sectarian schools because the "taxes are supporting fellow residents rather than the schools." However persuasive plaintiffs' arguments may be under federal law, these arguments do not address the state constitutional question that we must answer.

In my view, the First Amendment and the Compelled Support Clause cannot be read as parallel provisions. Textually, they differ markedly. The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. As noted, the concern under this clause is whether a particular government action is likely to result in "excessive entanglement" with religion. See *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). The critical question under the Establishment Clause, therefore, concerns the nature of the relationship between the state and the recipient religious organization.

By contrast, the relevant text of Article 3 of the Vermont Constitution states that "no person ought to, or of right can be compelled to

attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience." Vt. Const. ch. I., art. 3. The language of the Compelled Support Clause, on its face, bars the state from taxing citizens for the support of religion. Under the Compelled Support Clause, the insertion of a private decisionmaker between the governmental actor and recipient religious organization will not remedy the constitutional problem with transferring public funds to religious organizations. The critical question under the Compelled Support Clause is not the nature of the relationship between the state and the recipient religious organization, but the nature of the organization receiving public funds. That is, is it a "place of worship"?

Thus, while the religious nature of the recipient institution may not be determinative under the federal framework, it is *the* question under the Vermont Constitution. Again, because plaintiffs essentially see the religious nature of MSJ as irrelevant to the constitutionality of the tuition payment scheme (because they argue the payments are controlled by parents rather than the school), they make no argument, nor could they, that MSJ is not a place of worship. In other words, plaintiffs do not even attempt to make any distinction between religious education and religious worship, and it therefore seems unnecessary to undertake a lengthy analysis of this issue.

Nothing in our precedents compels a parallel reading of the Vermont and federal provisions. Plaintiffs contend that both *Swart v. South Burlington Town School District*, 122 Vt. 177, 167 A.2d 514 (1961), and *Vermont Educational Buildings Financing Agency v. Mann*, 127 Vt. 262, 247 A.2d 68 (1968), support this position. *Swart* held that tuition payments to sectarian institutions were unconstitutional under the First Amendment. In *Mann*, the Court sanctioned participation by a sectarian institution of higher learning in a program that assisted the construction of educational facilities through the use of state tax-exempt bonding. Neither case provides guidance here because, although each alluded to Article 3 of the Vermont Constitution, and *Mann* even went so far as to state that the Vermont Constitution provides no "explicit injunction precluding assistance to sectarian education," 127 Vt. at 269, 247 A.2d at 73, both cases were decided exclusively under First Amendment principles.

Both cases made statements concerning the relative sweep of the state and federal provisions. *Swart* stated that the First Amendment "seems . . . more demanding," i.e., more difficult to satisfy than Article 3. 122 Vt. at 184, 167 A.2d at 518. *Mann* asserted that "[i]n this

area, the limits of the First Amendment of the Federal Constitution are more restrictive." 127 Vt. at 269, 247 A.2d at 73. The suggestion being made by plaintiffs is that, since the tuition payment scheme at issue here would be constitutional under contemporary First Amendment analysis, it must, therefore, be allowable under the supposedly more permissive Vermont Constitution. Especially in light of the manner in which federal jurisprudence has changed in the thirty- to forty-year period since *Mann* and *Swart* were decided, I cannot agree with the proposition that the Vermont Constitution is the more permissive in this area. Furthermore, even if these statements were accurate when made, they were dicta, for in each case, the Court went on to treat the questions as matters to be resolved under First Amendment principles alone. Dicta, it need hardly be stated, have no binding precedential effect.

The present case highlights the problems that occur if we focus our concern on whether the Vermont Constitution is more or less restrictive than the United States Constitution. By doing so, we would lash construction of the Vermont Constitution to the unsteady mast of federal jurisprudence, ensuring that our interpretation will always be in relative terms rather than independently grounded. When federal jurisprudence changes, then our jurisprudence will be required to change as well. In fact, that is why plaintiffs are before us today: because the United States Supreme Court has shifted its Establishment Clause analysis in a way that suggests a more favorable outcome for public support of religious schools. It is preferable that our interpretation of the Vermont Constitution be distinct and freestanding, and that the Court articulate the adequate and independent state grounds for decisions when the Vermont Constitution is invoked. See *State v. Badger*, 141 Vt. 430, 449, 450 A.2d 336, 347 (1982) (although there are similarities between federal and Vermont constitutions, Vermont Constitution is not mere reflection of federal charter).

If we therefore decline plaintiffs' invitation to collapse Vermont's Compelled Support Clause into the federal Establishment Clause, the resolution of this case — based on the plain language of Article 3 and the facts before us — is clear. It also points clearly to the ways in which the majority unnecessarily complicates our analysis and holding in this case.

First, examining the history of Article 3 adds nothing to the resolution of this case beyond what can be gained from an analysis of the plain language of Article 3. Plain language should be our first

resource in interpreting the law, particularly when it provides as clear a guide as the plain language of the Compelled Support Clause does here.[2] Courts in other states that have considered the issue in light of similarly worded compelled-support clauses have concluded that the clause precludes the use of public funds to support sectarian schools. See *Williams v. Board of Trustees*, 191 S.W. 507 (Ky. 1917); *Findley v. City of Conneaut*, 62 N.E.2d 318 (Ohio 1945); *Almond v. Day*, 89 S.E.2d 851 (Va. 1955).

Second, the majority explicitly refuses to rest its analysis on the facts of this case, stating, "[T]his case is not about MSJ or any other parochial school as such." 169 Vt. at 318, 738 A.2d at 546. If this is true, I fail to see the point of the majority's lengthy recitation of facts pertinent to MSJ. Further, why is this case not about MSJ? We are generally bound to construe laws as constitutional, if possible. See *State v. Cantrell*, 151 Vt. 130, 134, 558 A.2d 639, 642 (1989) ("Where possible, a statute must be construed to avoid constitutional infirmities."). We will not declare a law unconstitutional on its face based on the possibility that it might be unconstitutionally enforced in some circumstances. See *Kimbell v. Hooper*, 164 Vt. 80, 88, 665 A.2d 44, 49 (1995). A proper decision in this case must be based on the factual record developed at trial, and the holding should be limited to the constitutionality of the tuition funding statute as applied in this instance.

Having declined to limit itself to the facts of this case, the majority embarks on a lengthy foray into history to address the supposed distinction between religious education and religious worship. Through this exercise, the majority attempts to predict when and under what circumstances public funding of sectarian schools would be permissible under Article 3. While these lines may be drawn some day, in a different case, there is no need and no justification on the facts of this case for attempting to do so today. There has been no

---

[2] I am as sensitive as the majority to the limitations of the "plain language" approach to constitutional interpretation, and I largely agree with the principles set forth in the majority opinion. See 169 Vt. at 326-29, 738 A.2d at 551-53. But the language of a document that is at the center of a controversy is virtually always the starting point for analysis. If one is to go beyond it, there must be reasons for doing so, such as ambiguity in the language, history or precedent that calls its apparent meaning into question, the existence of facts or circumstances that may not have been contemplated when the language was set down, or other factors. It is always an appropriate course to search for such factors, but none have been unearthed here. The majority's search in this case appears to have been triggered by a determination that it was necessary to distinguish between religious education and religious worship, a question I find irrelevant under the facts presented here.

effort whatsoever on the part of plaintiffs to demonstrate that the MSJ curriculum does not involve the propagation of religious beliefs. In fact, plaintiffs have purposely demonstrated the opposite — that MSJ is pervasively sectarian — in order to test the question of whether public funding of such an institution is constitutional. It clearly is not, and we should limit our holding to that conclusion, rather than speculating about the potential constitutionality of factual situations that are not before us.[3]

---

[3] The majority infers that I "would find unconstitutional any subsidy for activities in or by a sectarian school, irrespective of the sectarian nature of those activities." 169 Vt. at 342 n.24, 738 A.2d at 562 n.24. It is precisely because of my belief in the primacy of the facts presented in this case that such an inference is wholly unwarranted. If and when such activities come before us, I would address them in their context, as I have attempted to do here.